448 So.2d 645 (1984)
STATE of Louisiana
v.
Mark D. DAVIS.
STATE of Louisiana
v.
Bryan D. WINDHAM.
Nos. 82-AW-2134, 82-AW-2135.
Supreme Court of Louisiana.
February 27, 1984.
*647 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ronald C. Martin, Dist. Atty., Michael Bonnette, Asst. Dist. Atty., for plaintiff-appellee.
Thomas A. Wilson, Jr., Wilson & Veatch, Shreveport, for defendant-appellant.
DIXON, Chief Justice.
Defendants were charged with taking illegal deer, in violation of R.S. 56:123(E)(1). Windham was found guilty by the district judge. Davis then pleaded guilty, reserving his right to appeal. Both defendants received sentences of ninety days in jail, five hundred dollar fines, and had their rifles confiscated. Eighty of the ninety days were suspended, and the remaining ten days were to be served on three weekends. Applications were filed for writs, but review was granted as through the cases were here on appeal. 421 So.2d 912. The convictions and sentences are affirmed, except the confiscation of defendants' rifles, which is reversed.
During the early morning hours of December 29, 1981, a small group of deer hunters from Shreveport, of which group both defendants were members, took up stands in the Hall's Break area of Natchitoches Parish. Around daybreak, a larger group of local hunters arrived in the area with their dogs. The stands in which the Shreveport group had positioned themselves were the stands customarily used by the local group.
Defendant Windham, who was about twenty years old and already an experienced hunter, was waiting in his stand. The local group's dogs were running, and Reverend Hussar, a member of the Shreveport group, fired two shots into the air to excite the dogs. Defendant Windham, after hearing the shots and the dogs, spotted two doe and a spike buck running past him. He fired twice, and, due to the jamming of his weapon, fired a third time, into the air. When first spotted, the spike buck was only ten to fifteen yards away from defendant Windham, so he could tell that the deer at which he had shot had four to six inch spikes.
Since his shots had not killed the deer instantly, the deer kept running. After waiting a moment, defendant Windham began following the deer's trail. He said that he could find no trace of blood along the trail, and so he was not sure if he had hit the deer. He was discussing the events with his hunting companion, Eric Dice, when Coy Birdwell, a member of the local hunting group, came up the hill and asked who had shot. Defendant Windham responded that he had shot at a spike buck, so Mr. Birdwell went back down the hill where his companions were waiting.
Members of the local group then spotted an injured doe, which was stumbling through the woods. Their dogs also spotted the deer and were "all over it." Mark *648 Stewart of the local group saw that the deer was in agony, so he fired one shot into the deer's neck to put it out of its misery. After Mr. Stewart killed the doe, the group returned up the hill, yelling at defendant Windham that he had shot a doe, and not a spike buck. The group, led by Mr. Birdwell, placed defendant Windham under citizen's arrest. The entire group then went down the hill.
While the group was standing around, defendant Davis came down the hill, "boasting" that he, too, had shot a doe. Coy Birdwell radioed to Vernon Birdwell, who, in turn, notified the Department of Wildlife and Fisheries of the doe shooting incidents. Agent Carson arrived at the scene, responding to a call concerning the taking of illegal deer. When he arrived, he identified himself as an agent with the Louisiana Department of Wildlife and Fisheries. He asked the group, in general, who shot the deer. Both defendants readily admitted that they had done the shooting. Agent Carson asked defendants for their identifications and licenses. At this point, no one was placed under formal arrest by Agent Carson. They proceeded to the body of the first deer and Agent Carson allowed defendant Windham to use his knife to gut the deer in order to avoid spoilage. In the meantime, some of the other hunters went looking for the body of the deer defendant Davis said he killed, but were unable to find it. Defendant Davis said that he knew where it was, and Agent Carson allowed him to go with the hunters to find the deer. After the second doe was gutted, both were placed in the back of Agent Carson's pickup truck, and defendants were taken by Agent Carson to a location along the highway where they waited for Major Tracy Lucky. After Major Lucky arrived, he and Agent Carson conferred, and they agreed that they had cases against the defendants. It was at that point that the two defendants were informed that they were under arrest. Once in Agent Carson's truck, on the way to Natchitoches for booking, Agent Carson read defendants their constitutional rights from a card that he carried with him.
Defendant Windham testified, and defendant Davis confirmed, that he made no statements to Agent Carson after he had been read his rights. The state, however, says that statements were made while in transit to Natchitoches.
Prior to trial, defendant Davis filed, among others, motions to suppress evidence and to quash. In the motion to suppress, defendant Davis sought to suppress "all descriptions or accounts of, all references to, all statements concerning and anything whatsoever pertaining to the very existence of the deer." By this motion, defendant Davis sought to exclude any and all statements made by himself to Agent Carson, as well as evidence of the deer itself, since the body was found only because of defendant Davis' statements. In the motion to quash, defendant Davis asserted that the statute under which he was charged was unconstitutional. Defendant Windham also filed motions to suppress and to quash. However, in his motion to suppress, defendant Windham only sought to suppress statements made by himself, and not to suppress evidence of the deer's existence. The motion to quash was identical to defendant Davis' motion to quash.
After trial, defendant Windham was found guilty, and, after adverse rulings on his motions, defendant Davis pleaded guilty, reserving his rights to appeal the rulings on the motions. At a joint sentencing proceeding, both defendants were sentenced to the maximum penalty (R.S. 56:33) for a first offense, class three violation five hundred dollar fine and ninety days in jail, eighty days suspendedand had their weapons confiscated. Defendants appeal the rulings on their motions, their sentences and defendant Windham challenges the failure of the trial court to enter a directed verdict or a verdict of acquittal.
Motions to Quash
The statute under which defendants were charged provides that "[v]iolation of the provisions of this Section ... by the hunting or taking of illegal deer or turkeys in open season constitutes a class three *649 violation." R.S. 56:123(E)(1). Four bases are presented which, defendants allege, render the statute unconstitutional: vagueness, overbreadth, improper delegation of legislative authority to the executive branch, and improper promulgation of administrative regulations.
In order for a law to avoid being unconstitutionally vague, it "must describe the unlawful conduct with sufficient particularity and clarity that ordinary men of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto." State v. Dousay, 378 So.2d 414, 416 (La.1979). See also State v. Stilley, 416 So.2d 928, 929 (La.1982); State v. Baron, 416 So.2d 537, 538 (La.1982). By itself, § 123(E)(1) is vague in that it, as well as the remainder of Title 56, fails to define "illegal deer" with the requisite clarity and particularity. However, R.S. 56:123(A) provides that the commission may restrict hunting, and R.S. 56:124(1) provides that "antlerless deer, except spotted fawns may be taken only in accordance with and subject to such rules as may be adopted by the [Wildlife and Fisheries] commission with the advice of the department staff biologists." While this section unambiguously refers the reader to the extra-statutory rules, the statute, itself, does not put the average person on notice as to what the prohibited activities are.
The rules referred to are those promulgated by the Wildlife and Fisheries Commission, and are contained in the annual publication Louisiana Hunting, Fishing, and Motorboat Regulations, as well as in the Louisiana Register. 7 La.Reg. 357 (July 20, 1981).
Contained in the regulations promulgated by the commission are clear descriptions of what animals may and may not be hunted during clearly specified seasons. Under the heading "1980-81 Deer Hunting Schedule General," the regulations provide:
"A. Bag, one legal deer per day, six legal deer per season.
B. A legal buck is a deer with visible antler, hardened bony material having no velvet, broken naturally through the skin. Killing bucks without at least one visible antler as described above and killing doe deer is prohibited except where specifically permitted.
C. Deer hunting restricted to legal bucks only, except where otherwise permitted.
D. Either sex deer is defined as male or female deer. The taking of spotted fawns is prohibited.
..." 7 La.Reg. 357 (July 20, 1981). (Emphasis added).
"Either sex hunting" is allowed in Natchitoches Parish on "[t]wo days, Nov. 21 and Nov. 27." Id. at 360. Considering the foregoing regulatory proclamation, there is no vagueness in the commission's prohibition against the hunting of doe deer.
While the statute itself does not define illegal deer specifically, the statute clearly directs the reader to consult the regulations of the Wildlife and Fisheries Commission, and those regulations are clear and unambiguous.
Defendants also argue that the statute is unconstitutionally overbroad. The thrust of their arguments is that the statute encompasses the "innocent" taking of doe, such as the accidental killing of a doe as it darts in front of a moving automobile which is traveling down a major United States highway, or the "mercy killing" of a doe in obvious pain (such as was done by Mr. Stewart, one of the state's witnesses). The standard of review of a statute which is alleged to be overly broad in its scope is whether the choice of sanctions of lawfully regulated activity infringes upon the exercise of protected freedoms. State v. Cannon, 383 So.2d 389, 394 (La.1980), cert. denied, 454 U.S. 1052, 102 S.Ct. 596, 70 L.Ed.2d 587 (1981). There are no such protected freedoms involved here. Furthermore, there are no constitutional prohibitions against the imposition of criminal sanctions for "accidental" wrongful conduct. See, e.g., R.S. 14:32 (negligent homicide); R.S. 14:42(4) (aggravated rape where the victim is under twelve years of age, *650 and lack of knowledge of the victim's true age shall not be a defense).
Next, defendants argue that the delegation of the power to determine what conduct is unlawful is a prohibited delegation of legislative authority to a department of the executive branch. Defendants argue that the Wildlife and Fisheries Commission is a creature of statute, R.S. 56:1, and thus not capable, under La. Const. art. 2, § 2, of receiving constitutionally legislative powers, as are prescribed by R.S. 56:123(A) and 56:124(1). The issue, then, is whether there is a constitutional mandate which allows the legislature to delegate part of its rulemaking authority to the commission.
This court has stated that:
"... The definition of criminal conduct is solely a legislative function, and the delegation of legislative power is strictly limited in Louisiana by the state Constitution.
. . . . .
In State v. Snyder, 131 La. 145, 59 So. 44 (1912), this court upheld a criminal conviction for violation of the sanitary code. The court was careful to note, however, that Art. 296 of the Constitution of 1898 expressly provided that `[t]he General Assembly shall create for the State, and for each parish and municipality therein, Boards of Health, and shall define their duties, and prescribe the powers thereof,' so that the delegation of legislative power was constitutionally authorized...." State v. Dousay, supra at 415-16 n. 2.
A situation perfectly analogous to State v. Snyder exists in the cases before this court.
The Louisiana Constitution of 1974 expressly provides:
"(A) The control and supervision of the wildlife of the state, including all aquatic life, is vested in the Louisiana Wildlife and Fisheries Commission. The commission shall be in the executive branch ...
(B) The functions, duties, and responsibilities of the commission and the compensation of its members, shall be provided by law." La. Const. art. 9, § 7.
The establishment of the commission here is done by this provision of the Constitution, as was the establishment of the board in State v. Snyder. Because of this constitutional grant of authority to the legislature to delineate the powers of the commission, the legislative delegation of the power to the commission to make exceptions to the prohibition against taking antlerless deer is a proper and constitutional delegation of power.
Finally, defendants argue that the rules of the commission were not promulgated properly, and that the burden is on the state to prove proper promulgation. To the contrary, there is a presumption of propriety, and the burden is on the party challenging the promulgation to prove the defects. In relation to the passage of a statute, this court has stated that, "In the absence of any suggestion of any fatal irregularities or the non-observance of any essential requirement in the passage of [an] act, the court must necessarily assume that it was legally adopted." Middleton v. Police Jury, Parish of Jefferson, 169 La. 458, 467, 125 So. 447, 451 (1929). We reaffirm this assumption and also apply it to administratively adopted regulations. Since there is no specific allegation of irregularity in the promulgation of either the statute or the commission regulations, the unrebutted presumption of validity makes the contention of defendants meritless.
Motions to Suppress
Pre-Miranda Evidence
The game warden's office received a call informing them of the shooting of illegal deer, and that some men were being held by other hunters in connection with the shootings. In response to the call, Agent Carson went to the scene. Knowing only that illegal deer had been shot, Agent Carson approached the group of hunters, and, before anyone told him which of the men were being held, he asked the group in general, "who shot the deer?" According to Agent Carson's testimony, both defendants responded that they had done the *651 shootings. Agent Carson testified that at the time of his arrival he did not know which of the hunters had done the shootings. Defendants argue that Agent Carson, once he knew which of the hunters were being held, should have read the suspects their constitutional rights.
Miranda warnings are not required when the law officer is making a general, on-the-scene investigation to determine whether there has been the commission of a crime, and, if so, by whom. State v. Brown, 340 So.2d 1306, 1308 (La.1976).
"... Where no finger of suspicion has been pointed at a defendant and where he is not the focus of an investigation of a particular crime, we are unwilling to curtail the ability of the police to investigate potential criminal activity. Such a ruling would require that the police administer Miranda warnings to all persons whom they question as to potential breaches of the law, even where the officers are in the preliminary investigatory process of determining whether any crime has indeed been committed...." State v. Mitchell, 437 So.2d 264, 266 (La. 1983).
At the time of Agent Carson's undirected query, he had pointed no "finger of suspicion" at anyone. The mere fact that there had been a reported citizen's arrest did not put the agent on notice as to which of the hunters were being held. Agent Carson was making a preliminary investigation and was not required to advise anyone of the rights guaranteed under Miranda. All statements made to Agent Carson immediately upon his arrival were properly admissible, and the denials of the motions to suppress, in this regard, were proper.
Defendant Davis additionally seeks to suppress the evidence of the corpse of the deer, on the basis that, once he informed Agent Carson that he had shot one of the doe, the investigation focused upon him, and he was then entitled to be read his constitutional rights. La. Const. art. 1, § 13.
As already stated, a person does not have the right to have his constitutional rights read to him when statements are made to a police officer when the officer is performing an on-the-scene investigation to determine if, indeed, a crime has been committed. State v. White, 399 So.2d 172, 174 (La.1981); State v. Brown, supra. At the time of defendant Davis' locating the corpse, Agent Carson still had not determined that there was sufficient evidence to conclude that a crime had been committed. Agent Carson, even after defendant Davis told him that he had killed a doe, did not question Davis any further at the scene. According to Davis' own testimony:
"Well, one of the guys asked menot Major (sic) Carson but one of the other guys asked me where the deer was. And I told him he was maybe sixty yards on the other side of my stand. And they asked Major (sic) Carson if he wanted them to go get the deer. And he said, `Yeah, go get it and bring it back down here.' So, two guys left, a young guy about eighteen I'd sayhe was wearing a sidestrap pistolhim and an older man left in a stepside pickup. And they came back in about fifteen minutes. And they said, `We can't find the deer.' And one of the guys asked me did I know where the deer was. And I said, `Yes, sir.' And Mr. Carson told me to go up there with them and get the deer and put it in the truck and bring it back up here. So me and the guys left and I showed them the deer and we put it in the truck."
Thus, defendant Davis' locating the deer was done at the request of, and in response to, the private hunters, and not to the law officer.
Defendant Davis argues, however, that he was in the custody of Agent Carson at the time he located the deer corpse, and so should have been given his Miranda warnings. "Custody" is determined from "circumstances indicating an intent to effect an extended restraint on the liberty of an accused," State v. Tomasetti, 381 So.2d 420, 423 (La.1980), and it must be judicially determined, objectively and in retrospect, if the person has been *652 significantly detained so as to mandate the advising him of his rights. State v. Thompson, 399 So.2d 1161, 1167 (La.1981). According to Agent Carson, defendant Davis was free to leave at the time he located the deer for the other hunters. While it is true that Agent Carson would have stopped defendant Davis had he attempted to leave, that expression of restraint had not been made to Davis. It is clear that defendant Davis was not in the custody of Agent Carson, because Carson did not take any precautions or impose any conditions upon defendant Davis, or the other hunters, when Davis went with the hunters to find the corpse. Additionally, there is no evidence that there was any coercion against Davis, or that his locating the deer was not done voluntarily.
Because defendant Davis' location of the deer was made at a pre-custodial, on-the-scene stage of an investigation, and also because the location information was given to private citizens and not to a law enforcement agent, there was no need to give Miranda warnings. Thus, all statements made by defendant Davis prior to his being taken into custody were admissible. The trial judge's refusal to grant defendant Davis' motion to suppress all evidence of the deer's existence was proper.
Post-Miranda Statements
After meeting with Major Lucky, Agent Carson took both defendants to Natchitoches for booking. Along the way, they were informed that they were under formal arrest, and were advised of their constitutional rights. The state presented the testimony of Agent Carson, wherein he stated that defendants made statements to him concerning their respective crimes. Agent Carson stated that defendant Windham told him that he saw three deer, one of which was a buck, and that he thought that he was shooting at the buck. Defendant Davis told Agent Carson that he saw two "flags" and shot just to be shooting. Defendant Windham denied (and defendant Davis confirmed) that he had said anything to Agent Carson while en route to Natchitoches. Defendants sought to suppress the alleged statements made by them after their formal arrest and advise of rights. The trial judge denied the motions. Only defendant Windham appeals this denial; defendant Davis has abandoned this assigned error.
The basis upon which defendant Windham challenges the admission of his post-Miranda statements is that those statements were "tainted" by the earlier activities. Since all of the earlier statements were obtained lawfully, there was no "tainting" of the subsequent statements. Agent Carson testified that defendant Windham signified that he understood his Miranda rights. There is no evidence of involuntariness on the part of defendant Windham. Since there is neither "tainting," nor evidence of coercion, any statements made by defendant Windham after he received his Miranda warning were made with sufficient freedom and intelligence to be considered as waivers of the right to remain silent. Any statements made by Windham during the trip to Natchitoches were admitted properly.
Considering the foregoing, the trial judge was correct in his denial of defendants' motions to suppress statements and other evidence.
Sentencing
Defendants argue that the trial judge failed to follow the sentencing guidelines, as established in C.Cr.P. 894.1.
The trial judge, during the sentencing phase of the procedure, stated:
"Mr. Windham was found guilty by the court on the testimony of Mr. Youngblood, Mr. Stewart and Mr. Birdwell. Mr. Davis has now plead guilty having stipulated most of the testimony and having some adverse rulings to certain motions. People of Natchitoches take their deer hunting very serious. The people of Natchitoches Parish have been very cooperative with the law enforcement personnel with the Louisiana Wildlife and Fisheries. Had the people not stopped you two young gentlemen and placed you *653 under what's called citizen's arrest and called the State game wardens probably you would have put the two illegal deer in your vehicles and returned to Shreveport with your trophies and gladly shown them off to everybody. You chose to commit the crime now you must pay the price. The maximum penalty that I can impose on you for the first offense is a fine of not less than five hundred dollars or imprisonment of not more than ninety days or both. It is the sentence of this court that each of you pay a fine of five hundred dollars and be imprisoned in the Natchitoches Parish Jail for ninety days. I'm going to suspend the ninety, all but ten days of the ninety day sentence and will allow you to serve three weekends in the Natchitoches Parish Jail to count as your ten day jail sentences. And I want you to go back to Shreveport and tell your friends that if you come down to Natchitoches Parish and you come before Judge Cunningham for illegal deer that it's not going to be ten days for them; it's going to be ninety. And I hope you've learned your lesson."
The Code of Criminal Procedure sets forth the items which must be considered by the trial judge before passing sentence. C.Cr.P. 894.1. The trial judge need not recite the entire checklist of article 894.1, but the record must reflect that the judge adequately considered the guidelines. State v. Soco, 441 So.2d 719 (La.1983); State v. Trahan, 412 So.2d 1294, 1296 (La.1982). The judge must, in effect, justify his sentence with factual reasons. State v. Soco, supra; State v. Jones, 398 So.2d 1049, 1052 (La.1981).
Even in the absence of adequate compliance with the mandate of article 894.1, it is not necessary for this court to remand the matter for resentencing in compliance with the article when the sentence imposed is not apparently severe in relation to the particular offender or the actual offense committed. State v. Jones, 381 So.2d 416 (La.1980). In light of the seriousness of the offense of shooting doe, the sentence is not severe. Mitigating factors were taken into account by the trial judge, as evidenced by the suspension of eighty of the ninety days of imprisonment, and by permitting defendants to serve their sentences on three weekends.
However, the court did err when it ordered the confiscation of defendants' firearms. R.S. 56:33 expressly provides for the confiscation of things seized by the commission only for the second or third convictions for class three violations. C.Cr.P. 891 provides for the forfeiture of weapons used in connection with any offense. While it is true that the provisions of R.S. 56:33 are not wholly inconsistent with C.Cr.P. 891, there is an ambiguity as to which law controls in this instance, since these were defendants' first game law violations. Any ambiguity must be resolved in favor of leniency toward defendants, and against the state. R.S. 14:3; State v. Freeman, 411 So.2d 1068, 1072 (La.1982); State v. Cox, 344 So.2d 1024, 1026 (La.1977). The ambiguity created by the possible conflict of the statutes must be resolved in favor of defendants, and against the imposition of the greater punishment.
Accordingly, that part of defendants' sentences ordering the confiscation of their weapons is reversed and set aside, and it is ordered that the firearms be returned to defendants. Otherwise, the convictions and sentences are affirmed.
DENNIS, J., concurs. This is a misdemeanor case. Otherwise I would be concerned about the opinion's delegation of crime definition authority to an executive agency. Also, I do not agree that the crime definition covers accidental takings.
CALOGERO and LEMMON, JJ., concur.