DUFRESNE, Judge.
The defendant, Paul Winborn, was charged with second degree murder, R.S. 14:30.1. He entered a plea of not guilty and not guilty by reason of insanity. After due proceedings, he was tried by a jury and found guilty as charged. The trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant now appeals urging one of six assignment of errors.[1]
FACTS
At approximately 2:30 p.m. on March 25, 1983, the defendant took four (4) year old Stephanie Stonehouse to a wooded area near her home in the rural suburbs of Marrero, Louisiana, where he beat her with a tree log then shot her to death so that she would not tell on him. The body was left in the woods and the defendant went home. That evening about 6:30 p.m., the defendant was questioned by police investigating the disappearance of the little girl, and he later gave statements and confessed to her killing.
At trial the testimony of Dr. Alvaro Hunt, a certified pathologist, revealed that the victim suffered bruises on her head, face, neck and upper chest from a beating with a blunt instrument, but dies from a gunshot wound of the left temple.
Homicide Detective Barry Wood testified at trial and identified a large tree branch found near the victim’s body suspected of being used as a bludgeoning instrument. (State’s exhibit 22). He also identified spent casings seized from the bureau in defendant’s room. (State exhibit 33).
Detective Steve Buras testified that he retrieved a loaded .22 caliber revolver from the defendant’s home. (State exhibit 21). Jefferson Parish crime technician and fire arms technician, Ron Singer, testified that the gun seized from the defendant’s house fired the fatal shot. (State exhibit 30).
*119 Defendant’s next door neighbor, Mildred Bergeron, testified at trial that at about 11:45 a.m. she saw the defendant go into the victim’s yard, get the dog she was playing with, and tie it in his front yard. She heard the defendant call the victim to play with the dog. Ms. Bergeron was collecting the mail for the defendant’s foster mother, Ms. Highsmith, while Ms. Hi-ghsmith was out of town, and she told the defendant to untie the dog because the mailman would not leave the mail with the dog there. The defendant did not untie the dog and when Ms. Bergeron left her home about 12:45 p.m. the victim and the defendant were still playing with the dog in the defendant’s front yard. Ms. Bergeron returned home at about 2:30 p.m. and saw the defendant peeping around the side of his carport as the victim’s mother, Mrs. Stonehouse, was driving into her carport. After Mrs. Stonehouse parked and went into her house, Ms. Bergeron observed the defendant leave on his motorbike.
The defendant’s employer, Randle Dean, testified that the defendant had arrived at work about 1:45 p.m. asking for his pay check in order to leave town because he had shot a burglar and his dad told him to leave town.
ASSIGNMENT OF ERROR NUMBER 3
The trial court committed reversible error in denying defense counsel’s motion to suppress inculpatory statements, confession and evidence.
The defendant made this assignment of error to the admission in evidence of the confession of the defendant. He relies on Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The background facts are these: On March 25, 1983, at about 3:00 p.m., Detective Perez began a missing child investigation on Lisa Drive in Marrero, Louisiana, for the little girl, Stephanie Stonehouse. When he arrived at this neighborhood, he talked to several of the neighbors, including one Mildred Bergeron at about 6:30 p.m., who said that she had last seen the little girl playing with a dog in the defendant’s front yard about noon. From here, Detective Perez went to the defendant’s home, which was the home of Mr. and Mrs. Highsmith, the foster parents of the defendant. The defendant was not there, but Mr. Highsmith gave Detective Perez permission to check around the yard for the little girl.
Detective Perez searched around the area and was about to leave after finding nothing when the defendant came riding up on his motorcycle. Detective Perez informed the defendant that he was searching for the little girl, and that a neighbor said that she was last seen playing with the dog and the defendant. Detective Perez asked if the defendant could direct him to the owner of the dog that the little girl was last seen playing with, and the defendant then brought Perez and another officer, Officer Theriot, to a trailer park. He pointed to a trailer and said the owner lived in it, so the officers knocked but no one answered.
The officers next spoke to the little girl’s brother who suggested that they search inside of their house because his sister liked playing hide and go seek. While the officers searched the little girl’s home, the defendant went home.
After the search, the officers went back to the defendant’s house. Detective Perez asked the defendant what was the time that he last saw the little girl and where did he go afterwards. The defendant told him that he’d last seen her about 1:30 p.m., just before he left to get his pay check from his boss. After finally making contact with Mr. Dean, Detective Perez explained the situation and he said that the defendant had come around about 1:30 p.m. for his pay check because he had claimed that he had to leave town fast because someone had broken into his house and he had shot him. After hanging up, Detective Perez received permission from Mr. Hi-ghsmith to speak alone with the defendant.
At first the defendant denied telling his boss anything about a burglar, but later asked to speak privately with Detective Perez in his father’s bedroom. After they *120 got into the bedroom, Detective Perez told the defendant, “that if he had anything to do with the missing girl, that anything he would say would be used against him and that he did not need to talk to me — that he could seek legal help....” To which the defendant responded that, “I don’t need any legal help and I had nothing to do with the little girl.”
After about 15 minutes of inconsequential talk, Detective Perez suggested that the defendant show him where the puppies in the back of the house were. The defendant and Detective Perez then went outside and through the back yard, over a fence and through a horse pasture searching for the puppies. They saw a dog but no puppies. It was now about 8:30 p.m. and when they started back to the house, Detective Perez remarked “that it was getting late and that really we should find the girl and if he knew where the girl was or where the dog that the girl was going for, it was his duty and responsibility to try to help us.” The defendant again replied that he had nothing to do with the little girl, but he would help.
As they were walking back towards the fence and the Highsmith’s backyard, Detective Perez said, “Well, you know if the girl was hurt or lost in the woods at nighttime, that we would have a hard time trying to find her.” The defendant responded this time that, “Well the girl is not hurt.” Detective Perez asked how he knew and the defendant continued with the statement, “Because the girl is not hurt and that she might be lost in the woods — but she is not hurt.” According to Detective Perez, he then immediately and fully advised the defendant of his constitutional rights. Again the defendant responded that he had nothing to do with the little girl.
However, just as they got to the fence and began to climb over, the defendant abruptly said “Well, I know the girl is not hurt, I shot her_ she is dead.” Detective Perez asked where was the body, and the defendant told him that he would show him but he didn’t want to see the body. Detective Perez then advised the defendant that he was under arrest for first degree murder.
It was now about 9:30 p.m. and the defendant showed Detective Perez and two other officers where the body was after which he was transported by Detectives Miller and Mistretta to Juvenile Division on 200 Huey P. Long Avenue in Gretna, Louisiana, while Detective Perez and other officers continued the investigation.
At about 10:00 p.m., the defendant was in custody at the station and Detective Perez began interrogation. He advised the defendant for the third time of his Miranda rights. The defendant was asked if he needed anything to eat or drink, and was given a coke and potato chips which he ate. The defendant then made a taped statement confessing to first beating the little girl with a tree log and then shooting her so she would not tell on him.
Prior to admitting these statements into evidence, the trial court conducted a hearing outside of the presence of the jury to determine whether the statements were admissible. After counsel’s argument, the trial judge denied the motion to suppress and maintained his previous ruling (that defendant’s statements were voluntarily given) at the earlier suppression hearing.
Defendant cites as error the trial judge’s denial of his motion to suppress the confession. Since the statements admitted into evidence are claimed to involve pre-M-randa and post-Miranda statements, we will consider the statements separately.
Defendant argues that his initial statements that he had shot the little girl was inadmissible because the defendant was not advised of his right to remain silent under the Miranda rule. It is also well settled law that Miranda warnings are not required in non-custodial, general, on-the-scene interrogations to determine whether a crime has been committed and, if so, by whom. State v. Davis, 448 So.2d 645 (La.1984); State v. Brown, 340 So.2d 1306 (La.1976); State v. Patterson, 464 So.2d 811 (La.App. 5th Cir.1985).
*121 According to the testimony of Detective Perez, he advised the defendant of his Miranda rights, including his right to remain silent, immediately after the defendant made the statement that “the girl is not hurt...” Defendant’s confession, that he shot the girl, was made after these Miranda warnings, and therefore admissible.
Defendant’s statement prior to being advised of his Miranda rights (that he knew the little girl was not hurt in the woods) are also admissible because according to Detective Perez, it was not until that moment that the defendant was a suspect, and until then he had had no reason to believe that any crime had been committed.
While in custody at the Gretna Police Department, the defendant made additional statements and a confession which was recorded (State’s Exhibit 42). Defense counsel also complains of the introduction of the taped confession and statements arguing that the defendant’s confession was induced by a promise made by Detective Perez that he would obtain help for him. Defense counsel argues that this promise and the fact that the defendant had a very low I.Q. combined to ineffectuate the defendant’s capacity to waive his constitutionally guaranteed rights as set forth in the Miranda decision.
To support the argument to suppress the confession because defendant did not intelligently waive his constitutional rights, defense counsel relies on testimony at the suppression hearing of Drs. Richoux and Arneson, and Dr. Richoux’s testimony at trial. In the instant case, at the request of the defense, the trial court appointed a sanity commission composed of Drs. Arne-son and Richoux, psychologists specializing in forensic psychology, to determine defendant’s mental capacity to proceed to trial.
At a sanity hearing held on February 16, 1984, Drs. Arneson and Richoux each testified after examining the defendant on February 1, 1984. Based on the doctor’s testimony, the trial court found him competent to proceed to trial. Although defendant was classified as borderline to mentally retarded with a full scale I.Q. of 73, a mental age of 10-12 years, and a history of drug abuse, Dr. Arneson stated that his retardation was insufficient to impair defendant’s ability to effectively participate in his defense.
On the motion to suppress and at trial, the state presented evidence concerning the circumstances surrounding the making of defendant’s statements. Detective Perez was the officer who questioned defendant after his arrival at the station. At the hearing on the motion to suppress, and at trial, Perez testified that he was not aware of any defect in the defendant’s mental abilities. Detective Perez testified that at 10:05 p.m. in the presence of Detective Mistretta, he began by explaining to the defendant his Miranda rights with the use of a “rights’ form”, (State’s exhibit 40) and that defendant responded that he understood his rights as they were being explained. The record reflects that Detective Perez explained these rights in the following manner:
A. “I read the Rights to him and then I had him read the Rights back to me and just a personal thing, I always have them initial the Rights after they read them to make sure they fully understood and if he had any problems with any of the words, I underlined those words.”
During the actual taping both Detective Snow, and Detective Mistretta were there; Detective Snow the entire time, and Detective Mistretta the major portion of the time. (Detective Snow corroborated Detective Perez’s testimony.) These officers further testified that no threats or coercion was used, and the defendant’s physical condition during waiver of rights and actual taping was normal, his speech was very precise and normal, and he did not appear to be intoxicated or on drugs.
A reading of the defendant’s actual statements appear to bear out that he understood his Miranda rights, waived them and freely made a confession. He knew details of what he’d eaten that day and at *122 what times, details of his clothing, as well as, the victim’s clothing, and time and details of his activities for the entire day. Moreover, the defendant denied that he had been induced, physically beaten or in any other manner forced to give a statement.
Testifying at his suppression hearing (on direct examination) defendant asserted that an officer had threatened him, and he denied that he was advised of his Miranda rights, or that he had signed a waiver of his Miranda rights. He denied that it was his voice in the taped statement, and denied killing the victim. But on cross-examination and on re-direct, the defendant remembered being fully advised of his rights and responding that he understood.
Paul Winborn, was eighteen years old at the time of his arrest. He had attended Sophia Grimble School (school for the retarded a.nd slow learners) until 1983, but he did not complete his schooling. He was able to read and write very little, but he had a Louisiana driver’s license and a job with a moving company which bought and sold trading store fixtures. Testimony from his employer established that defendant was a good worker, his job duties consisted of dismantling and moving store fixtures, and his relationship with his co-workers was very good. Before that he had worked at a hauling type job with a friend of the families who owned a dump truck.
Testimony at the sanity hearing and at trial placed defendant’s I.Q. between 65 and 73, but also established that defendant was capable of distinguishing between right from wrong, and of intelligently assisting counsel in his defense. The investigating officers testified that defendant was fully advised of his rights and that defendant indicated that he understood those rights.
Reviewing all the evidence the state did prove that the defendant intelligently waived his constitutional rights and voluntarily (and without coercion) confessed to the shooting death of the victim. La.R.S. 15:451; C.Cr.P. art. 703. Although defendant indicated in his testimony at the suppression hearing that he had abused liquor and drugs on the day of the offense, and that he felt this together with the officer’s offer to help him, induced his confession, nevertheless he stated that he would have confessed regardless, he knew what he had done was wrong, and he confessed because he hoped to get “help to get him out of the habit of doing stuff like this.” He stated that he fully understood each of his Miranda rights.
From this evidence the trial judge properly denied defense motion to suppress the defendant’s inculpatory statements and confession. Whether intoxication exists and whether it is of a degree sufficient to vitiate the voluntariness of a confession are questions of fact, State v. Narcisse, 426 So.2d 118 (La.1983). In addition to the defendant’s statement that he understood his constitutional rights and voluntarily made the confession, the trial judge had before him the corroborating testimony from the interrogating officers, Dr. Ri-choux, the defendant’s next door neighbor, and his employer which supports the conclusion that the defendant was not intoxicated (on drugs or alcohol). Accordingly, there was sufficient proof that the defendant was able to intelligently waived his constitutional rights; and that the trial court did not abuse its great discretion in concluding that the defendant’s statements and confession were knowingly and voluntarily made.
Accordingly, this assignment of error is dismissed for lack of merit.
For the above stated reasons, the conviction and sentence of the defendant are affirmed.
AFFIRMED.

. In his Assignment of Errors defense counsel presented six errors. However, in brief, only one of these, Assignmen of Error No. 3, was addressed.
Assignment of Errors not briefed or argued may be deemed abandoned. See Uniform Rules, Courts of Appeal, Rule 2-12.4 and State v. Smith, 452 So.2d 251 (La.App. 5th Cir.1984); State v. Becnel, 441 So.2d 339 (La.App. 5th Cir.1983).