536 So.2d 529 (1988)
STATE of Louisiana
v.
Anthony WARREN.
No. KA87 1678.
Court of Appeal of Louisiana, First Circuit.
November 22, 1988.
*530 Charles Genco, Asst. Dist. Atty., Amite, for plaintiff-appellee.
James Dukes, Asst. Public Defender, Amite, for defendant-appellant.
Anthony Warren, in pro. per.
Before WATKINS, GRAIN and ALFORD, JJ.
CRAIN, Judge.
Defendant, Anthony Warren, was charged by a grand jury indictment with second degree murder and use of a firearm during the commission of the offense, violations *531 of La.R.S. 14:30.1 and 14:95.2[1] respectively. After trial by jury, defendant was found guilty of manslaughter[2] and violation of La.R.S. 14:95.2. The trial court sentenced defendant to imprisonment at hard labor for consecutive terms of twenty-one years for the manslaughter conviction and two years for the La.R.S. 14:95.2 violation. Defendant has appealed, urging eight assignments of error. In brief, defendant expressly abandons assignments of error five, six and seven.

FACTS
The record reflects that the instant offense occurred on August 29, 1986, at about 2:00 a.m. in Amite, Louisiana. The victim of the offense was Jerry Curry.
Shortly before the offense, the victim and Pamela Johnson were standing near a car parked on the same side of the street on which Cut-Rate Bar is located. Defendant walked by the two of them, directed some profane language at Ms. Johnson, and continued across the street where he seated himself in the backseat area of Larry Galmon's parked car.
The victim apparently became concerned and wanted to know what defendant had told Ms. Johnson. Thereupon, the victim went over to Larry Galmon's car. The victim and defendant apparently initially argued before and/or after the victim got inside the backseat area of the car with defendant. A fight between the two erupted inside the car. The fight was interrupted when the participants both exited the car, apparently with some assistance of others. The fight, however, resumed outside the car but in close proximity to it.
Although the evidence showed that the victim's sister, Barbara Jean Curry, assisted the victim when the fight resumed, there was conflicting testimony as to whether or not the victim's brother, Danny Curry, also joined the scuffle at that time. Nonetheless, at some point during the ensuing fight, defendant pulled a .22 caliber revolver, which he had been carrying on his person. The victim, who was unarmed, began running across the street toward the Cut-Rate Bar with defendant in pursuit. When defendant fired the second of two initial shots, the victim fell to the ground, apparently when the bullet struck him in the leg as he tried to elude defendant. The victim tried unsuccessfully to get up. With defendant standing in close proximity to the victim, at a distance eyewitnesses approximated to be four to eight feet, defendant looked down at the unarmed, defenseless victim and vulgarly told him to die. At that time, defendant began firing his revolver again, shooting it approximately three to five times. Defendant then ran from the scene with Larry Galmon in pursuit.
Sgt. Terry Tullos of the Amite City Police Department was on patrol in his police unit in the area of the Cut-Rate Bar at the time of the incident. When he heard a series of gunshots, he proceeded in the direction of the bar. Upon arriving at the scene, Tullos observed the victim, and observed defendant being pursued by Larry Galmon. Tullos requested that an ambulance be sent to the scene and asked for police assistance. Tullos then began pursuing defendant and Galmon. When Tullos caught up with them, they were wrestling.
Assisted by another officer, Tullos took defendant into custody, placing him under arrest, and read defendant his Miranda rights. He then transported defendant to the police station.
Dr. Joseph Guilardo testified at trial as an expert witness in the field of pathology. He performed an autopsy on the victim on August 29, 1986. The autopsy disclosed that the victim sustained three gunshot wounds. One of the wounds was an entrance wound to the back of the right leg, behind the knee and extending upward. Another wound was an entrance wound to the left arm caused by a bullet which *532 lodged in the left shoulder. The remaining gunshot wound was to the anterior of the victim's neck, with the path of the bullet extending downward into the chest where the bullet passed through the aorta and left lung before lodging itself in muscle tissue in the victim's back. Dr. Guilardo recovered from the victim's body the three bullets which caused the gunshot wounds.
According to Dr. Guilardo, the victim's death was caused by the gunshot wound to the neck which resulted in a hemothorax. Dr. Guilardo testified that he found a pattern of stippling (gun powder deposited on the skin indicating the powder was from a bullet fired from very close range) near the victim's neck wound slightly above and to the right of the wound, which indicated the bullet traveled from the right side and downward.
Later, following defendant's arrest, officers returned to the scene, where they recovered defendant's .22 caliber revolver. The nine cartridge capacity revolver contained seven spent rounds of ammunition and two live cartridges. Jim L. Churchman, who testified at trial as an expert in the field of firearms identification, examined the revolver, the seven spent cartridge cases, and the three bullets Dr. Guilardo removed from the victim's body. He determined that all seven cartridge cases had been fired from the revolver as well as two of the three bullets taken from the victim's body. The third bullet was too badly damaged for Churchman to make a positive identification as to whether or not it had been fired from defendant's gun, although it was positively identified as a .22 caliber bullet.
ASSIGNMENT OF ERROR NO. 1:
By means of this assignment, defendant contends that the trial court erred by not suppressing statements he made to the police on August 29 and September 1, 1986. Defendant asserts that there was no evidence that he was advised of the instant murder charge or that an initial charge of aggravated battery had been changed to the murder charge before he made his September 1 statement. Defendant further argues that he was not given a "new" advice of his constitutional rights on September 1 prior to making the statement on that date.
At the hearing on defendant's motion to suppress, the state presented the testimony of Sgt. Terry Tullos and Captain Jerry Trabona of the Amite City Police Department. Defendant did not present any evidence. Later, at trial both officers again testified on behalf of the state.[3]
Sgt. Tullos testified that, at the time he took defendant into custody and placed him under arrest, he read defendant his Miranda rights. Defendant appeared to understand his rights and orally responded that he did so.
After he arrested defendant, Tullos took him directly to the police station and into a room to await the arrival of Captain Trabona. Shortly thereafter, Trabona saw defendant for the first time at the police station. Trabona testified that he was aware that defendant had already received an advice of constitutional rights; but, before he had defendant execute an advice of constitutional rights form (S-1), he advised defendant of his Miranda rights. Defendant appeared to understand his rights; and he filled out and signed S-1 in the presence of Trabona and Tullos, who signed as witnesses.
S-1 was executed on August 29 at about 3:13 a.m. Trabona testified that, when S-1 was originally filled out, the form stated that defendant had been charged with aggravated battery. Trabona explained that at that time he did not know the condition of the victim and for that reason he charged defendant with aggravated battery. According to Trabona, he told defendant that if the victim died he would be charged with murder. After defendant executed S-1, Trabona telephoned the hospital where the victim had been taken and *533 determined that the victim had died. Thereupon, Trabona "whited out" the words "aggravated battery" on the form and replaced them with the word "murder" to indicate that defendant was charged with murder. The change was made about ten to fifteen minutes after S-1 was originally filled out. Trabona testified that, when he learned of the victim's death, he told defendant that the victim had died and that he was going to change the charge to murder. Defendant reacted by saying "Oh, Lord" and crying.
Trabona testified that defendant did not make a statement on August 29. However, three days later, on September 1, defendant gave a tape recorded statement to Trabona. Trabona testified that, prior to obtaining the September 1 statement, he first advised defendant of his Miranda rights as reflected on the tape itself and that defendant appeared to understand those rights. Trabona testified that, although he did not advise defendant on the tape that the charge against him was murder, defendant knew he was charged with murder because he had so informed defendant when he learned of the victim's death.
Before a confession or inculpatory statement made by an accused during custodial interrogation can be introduced into evidence, the state must show that the accused was first advised of his Miranda rights. State v. Brown, 486 So.2d 876, 878 (La.App. 1st Cir.), writ denied, 489 So.2d 915 (La.1986). Herein, contrary to defendant's assertion, the evidence establishes that defendant was fully advised of his Miranda rights before he made a statement. On August 29, he was orally advised of his Miranda rights no fewer than two times and on that same day he executed S-1, an advice of rights form. Thereafter, prior to making a statement to the police on September 1, defendant was again orally advised of his Miranda rights.
In proving an intelligent waiver of the rights to silence, protection against self-incrimination and counsel, the state need not show that a defendant was aware of the full evidentiary significance of his statements. See State v. Mitchell, 421 So.2d 851, 852 (La.1982); State v. Williams, 521 So.2d 629, 631 (La.App. 1st Cir.1988). Moreover, as the United States Supreme Court recently noted, a suspect's awareness of all the crimes about which he could be questioned is not relevant to waive the Fifth Amendment privilege against self-incrimination. See Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). Herein, defendant's tape recorded statement was played to the jury in its entirety. The statement began with advice to defendant that the subject matter to be dealt with was the shooting of Jerry Curry and advice of Miranda rights. Defendant's actual statement followed that advice. Additionally, Trabona had advised defendant three days earlier on August 29 that he was charged with the murder of Jerry Curry.
Accordingly, the state established that defendant was advised of and waived his Miranda rights prior to giving his September 1, statement. Hence, the trial court did not err in denying defendant's motion to suppress the statement.
In reference to defendant's contention that the trial court erred by failing to suppress an August 29 statement made by him, Trabona denied that defendant gave such a statement. In any event, the state did not introduce such a statement at trial, so any possible issue as to the admissibility of such a statement is moot.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. 2:
By means of this assignment, defendant contends that the trial court erred by allowing the prosecutor to use leading questions to examine state witness Larry Galmon.
The alleged erroneous use of leading questions occurred during the state's redirect examination of Larry Galmon as follows:
Q. As Jerry Curry lay on the curb, he had been hit in the leg?
A. Yes.
Q. Was he still attempting to get up?
A. Yes, he was trying to run.
Q. Did he ever raise his body up and attempt to assume a sitting position?
*534 A. He was trying to get up.
Q. He was making every effort to get up, was he not?
BY MR. STRICKS:
Objection. Leading.
BY THE COURT:
Rephrase your question, Mr. Genco.
Q. Mr. Galmon, if you would, I'm going to borrow one from Mr. Stricks here. I am going to be Jerry Curry, I am on the floor, did Jerry Curry attempt to raise up like this?
BY MR. STRICKS:
I object, that's leading. He's, he's, he's doing it by act. Now if the roles are reversed.
BY THE COURT:
Overruled, Mr. Stricks.
BY MR. STRICKS:
I object, Your Honor.
BY THE COURT:
Note your objection. Note exception to the ruling of the Court.
Q. Did Jerry Curry attempt to rise up, such as this?
A. Yes, he did.
La.R.S. 15:277[4] defines a leading question as "one which suggests to the witness the answer he is to deliver" and prohibits asking such a question of one's own witness. Herein, the alleged improper leading questions concerned the victim's efforts to get up after he fell, apparently as a result of the gunshot wound to his leg. However, immediately prior to being asked those questions, the witness had testified that the victim was "trying to run," "trying to get up." In our view, the trial court was well within the limits of its sound discretion in permitting the state to utilize its rephrased questions in regard to the victim's efforts to rise. The questions were no more than an attempt to substantiate and/or clarify the witness' prior responses. See State v. Smith, 357 So.2d 798, 803 (La.1978); State v. Sheppard, 350 So.2d 615, 644 (La.1977).
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. 3:
By means of this assignment, defendant contends that the trial court erred by refusing to give his requested special jury charges numbers one and four pertaining to "sudden passion or heat of blood" and justification, respectively.
Defendant's requested special jury charge number four, pertaining to justification, sought the following instruction:
The reference point for analyzing the defense of justification is the moment the accused committed the criminal act charged. It is not now, the day of trial, some seven or eight months later.
You must determine whether or not the act of homicide was reasonable and apparently necessary to prevent great bodily harm and that the killing is necessary to save the accused from that danger.
Under the pressure of the circumstances, then, the accused would not have been expected to make fine legal judgments nor would he be expected to make the most correct factual determinations.
The accused must have acted reasonably and if you find that he did so and for legally justifiable cause, you should acquit him, that is return a verdict of Not Guilty.
In its charge to the jury, the trial court addressed the subject of justification, in pertinent part, as follows:
A homicide is justifiable if committed in self defense by one who reasonably believes that he is in imenant [sic] danger of losing his life, or receiving great bodily harm, and that the killing is necessary to save himself from that danger. The danger need not have been real as long as the Defendant reasonably believed that he was in actual danger. Some factors that you should consider in determining whether the Defendant had a reasonable *535 belief, that the killing was necessary, are: the possibility of avoiding the necessity of taking human life by retreat; the excitement and confusion of the occasion; the possibility of presenting [sic] the danger to himself by using force, less than killing; and the Defendant's knowledge of his assailant's dangerous character.
Thus, if you find that the Defendant killed in self defense, and that the Defendant believed he was in danger of losing his life or receiving great bodily harm, and that the Defendant believed the killing was necessary to save himself from danger, and that the Defendant's beliefs were reasonable in light of the circumstances, then, you must find the Defendant, not guilty.
It is the duty of the trial court to give a requested charge which does not require qualification, limitation or explanation and is not included in the general charge or in another special charge to be given, if it is wholly correct and pertinent to the case. LSA-C.Cr.P. art. 807; State v. Bennett, 454 So.2d 1165, 1185 (La.App. 1st Cir.), writ denied, 460 So.2d 604 (La.1984).
In regard to defendant's requested charge number one pertaining to "sudden passion or heat of blood," the substance of the requested charge was included in the trial court's general charge which defined "manslaughter." Thus, the requested charge was properly refused. Moreover, since the jury returned a verdict of guilty of manslaughter, clearly defendant suffered no prejudice by the denial of the requested charge. Similarly, the trial court also properly refused to give defendant's requested charge number four relative to justification because the requested charge was substantially given and covered by the court's general charge. See State v. Shilling, 440 So.2d 110, 114 (La.1983); State v. Garrison, 400 So.2d 874, 884 (La. 1981).
This assignment lacks merit.
ASSIGNMENTS OF ERROR NOS. 4 AND 8:
By means of these assignments, defendant contends that the trial court erred by imposing an excessive sentence, i.e., the maximum sentence for manslaughter. He also argues that the trial court failed to articulate any of the criteria set forth in La.C.Cr.P. art. 894.1 and in particular any mitigating circumstances.
Article I, § 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. Excessiveness of a sentence is a question of law which is reviewable. See State v. Sepulvado, 367 So. 2d 762 (La.1979). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Tate, 506 So.2d 546, 552 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987). In other words, a sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado, 367 So.2d at 767. A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether the penalty is so disproportionate as to shock our sense of justice. State v. Bonanno, 384 So.2d 355, 358 (La.1980). Moreover, maximum sentences are appropriately imposed only for the most serious violation of the described offense and for the worst kind of offender. State v. Mathews, 428 So.2d 988, 990 (La.App. 1st Cir. 1983). A trial court is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed by it should not be set aside as excessive in the absence of manifest abuse of discretion. State v. Lanclos, 419 So.2d 475, 478 (La.1982).
A trial court's reasons in imposing sentence, as required by La.C.Cr.P. art. 894.1, are an important aid to this Court when reviewing a sentence alleged to be excessive. State v. Christy, 509 So.2d 829, 831 (La.App. 1st Cir.), writ denied, 513 So.2d 296 (La.1987). The trial court need not recite the entire checklist found in La. *536 C.Cr.P. art. 894.1. However, the record must reflect that the court adequately considered the guidelines. State v. Davis, 448 So.2d 645, 653 (La.1984). Even when the trial court has not complied with La.C.Cr.P. art. 894.1, this Court need not remand the case for resentencing, unless the sentence imposed is apparently severe in relation to the particular offender or the offense committed. State v. Davis, 448 So.2d at 653.
Manslaughter is punishable by imprisonment at hard labor for not more than twenty-one years. La.R.S. 14:31. Use of a firearm during the commission of manslaughter (a crime listed in La.R.S. 14:95.2) subjects an offender, upon a first conviction for such a crime, to an additional mandatory penalty of imprisonment at hard labor for a term of two years to be served consecutively (to the penalty provided in La.R. S. 14:31) and without benefit of parole, probation, suspension of sentence or credit for good time. La.R.S. 14:95.2. Herein, defendant received the maximum sentence for manslaughter and an additional consecutive penalty of two years imprisonment at hard labor for use of a firearm during commission of the manslaughter.
In imposing sentence in this case, the trial court noted in its initial comments that it had presided at the trial and had listened to the entirety of the proceedings in the case. In further comments, the court stated the following:
Mr. Warren, if I had to sit on your jury, I would have found you guilty of second degree murder. The reason that I would have, Mr. Warren is because I think that the facts of the situation in those [sic] proceedings tell me that you are more likely guilty of second degree murder than you were of manslaughter, because Mr. Warren, as I appreciate the factual situation of that [sic] particular case, you ran a man down across the street and shot him while he was down. You had every opportunity in the world, Mr. Warren to retreat and run before you cross [sic] the street and shot him. Nothing in that record indicated to me that the argument that started all of this and the shooting took place on the same side of the street. It took place on opposite sides of the street. That means, Mr. Warren that both of you had to cross the street. By your own testimony the gun dropped and everybody ran. Mr. Warren that tells me that you ran after somebody and then you shot him. There is also evidence in the record, Mr. Warren that tells me that you shot him in the back of [the] leg as he was running, which brought him to the ground. Mr. Warren do I need to tell you that there is also evidence that you stood over him with a pistol and said "die"? Mr. Warren, considering what I have heard to be the evidence in this case and the severity of the crime, I do not find under any circumstances that you are a candidate for probation. I find that you are, Mr. Warren at best, at best, at some point and time in the future you would not be a menace to to [sic] society. Right now you are....
Even assuming arguendo that the trial court's stated reasons for sentencing set forth above do not amount to an adequate compliance with the provisions of LSA-C. Cr.P. art. 894.1, a remand for a more complete compliance with those provisions is unnecessary since the sentence imposed is not apparently severe in relation to defendant or the offense committed and the record otherwise clearly illumines the sentencing choice. Cf. State v. Robicheaux, 412 So.2d 1313, 1319 (La.1982).
Despite defendant's status as a first felony offender, in light of the heinous nature of the offense, we conclude that this case falls within the category of the most serious violations of manslaughter and that defendant represents the worst kind of offender involving manslaughter. Hence, we do not find the sentence imposed herein so grossly disproportionate as to shock our sense of justice. Accordingly, the sentence imposed is not excessive.
These assignments lack merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] This statute has been repealed by La. Acts 1988, No. 319, § 2, effective May 25, 1988; however defendant's prosecution thereunder was not affected as the trial took place in March, 1987.
[2] Manslaughter is a responsive verdict to second degree murder. See La.C.Cr.P. art. 814 A 3.
[3] In determining whether the trial court's ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. State v. Brown, 481 So.2d 679, 683 n. 1 (La.App. 1st Cir.1985), writ denied, 486 So.2d 747 (La.1986).
[4] This statute has been repealed by La. Acts 1988, No. 515, effective January 1, 1989. The Comments to article 611 of the Louisiana Code of Evidence indicate that the definition of a leading question has not been changed.