481 So.2d 679 (1985)
STATE of Louisiana
v.
Wayne Gene BROWN.
No. KA 85 0619.
Court of Appeal of Louisiana, First Circuit.
December 26, 1985.
*681 Bryan Bush, Dist. Atty. by Ernest Smithling, Asst. Dist. Atty., Baton Rouge, for plaintiff-appellee.
Brady Jones, Office of the Public Defender, Baton Rouge, for defendant-appellant.
Before GROVER L. COVINGTON, C.J., and WATKINS and SHORTESS, JJ.
GROVER L. COVINGTON, Chief Judge.
Wayne Gene Brown was charged by bill of information with armed robbery, a violation of La.R.S. 14:64. He pled not guilty and elected to be tried by a jury, which convicted him as charged. He was subsequently sentenced to serve twenty-five years at hard labor without benefit of parole, probation, or suspension of sentence. He has appealed, alleging twelve assignments of error. For the reasons hereinafter stated, we affirm his conviction and sentence.
I. SUMMARY OF FACTS AND TESTIMONY
On March 5, 1984, Lloyd Lambert was working as a car salesman for Coleman Oldsmobile in Baton Rouge. On that date, a man identified by Lambert as the defendant came into the dealership at about 3:00-4:00 p.m. and asked if he could road test a blue 1984 Oldsmobile Cutlass Supreme Brougham. Lambert told him that he could, and the two then left the dealership with defendant driving the car. After driving around Baton Rouge for some time, defendant stopped the car, pulled a knife, and told Lambert to get out of the car but to leave his wallet. Lambert described the knife as very pointed with a six- or seven-inch blade. Lambert told defendant he did not have a wallet, got out of the car as fast as he could, and started running. Defendant then drove off, heading north on Airline Highway. Lambert reported the incident to the police as soon as he returned to the dealership.
In response to a report received by the sheriff's office, Jerome Fontenot, a detective with the Pointe Coupee Parish Sheriff's Office, located a car on March 10, 1984, which was subsequently identified as the car taken from Lambert. The car was found in Pointe Coupee Parish in a "bar pit" behind the levee on La. Highway 981, about three tenths of a mile from the ferry landing. One of Lambert's business cards, which Lambert testified he had left inside the car, was found in the car. The front seats and the bottom portion of the rear seat had been taken from the car and replaced with torn maroon leather seats. A certificate of registration to another car, a 1972 Ford Torino registered in the name of defendant's brother, was also found in the car.
*682 Detective Fontenot testified that he had seen defendant driving the vehicle recovered from the "bar pit" on two previous occasions, viz. March 7 and 8, 1984.
Detective Carl H. Ryan, Jr., and Detective Steve Woodring of the Baton Rouge Police Department transported defendant on March 11, 1984, from New Roads to Baton Rouge after being informed that he was in the custody of the Pointe Coupee Parish Sheriff's Office. On the way to Baton Rouge, after having been advised of his Miranda warnings, defendant made an oral statement telling the officers that he had been coerced to commit the armed robbery by a "crime syndicate." Then, on March 15, 1984, defendant made a tape-recorded confession to the charged offense, after again being advised of his constitutional rights.
At trial, defendant took the stand in his own defense, denied ever having seen Lloyd Lambert before the trial, and denied making an oral statement to Detectives Ryan and Woodring. In regard to his taped confession, defendant asserted that the statement was involuntarily and unknowingly made as a result of alleged promises made by the "headman" of the armed robbery division of the Baton Rouge Police Department, whom he did not identify by name. He testified that he merely read a document given to him for taped transcription.
Defendant testified that he and Leo Balonie, Jr., went to Baton Rouge on the date of the instant offense to the home of his brother, Archie Brown. Archie Brown had to be at work for 3:00 p.m., and they took him there. They then ate, got some gas, and then Balonie took him to a mall, arriving there at around 4:00 p.m. He then was given a ride to the Continental bus station where he purchased a bus ticket to New Roads, after his girl friend, Marilyn Jones, failed to meet him at the mall. He reached New Roads at about 6:30 p.m. The next day, March 6, 1984, he met a guy named "Duck," to whom he was introduced by Balonie. He saw "Duck" with a blue 1984 Cutlass Supreme, which "Duck" told him he could drive around the block in New Roads. He did not remember using the car at any other time.
Balonie testified that he and defendant had gone to Baton Rouge on the date of the armed robbery and that he had taken defendant to Bon Marche Mall that afternoon between 3:30 and 4:00 p.m., where he left him. The next day, defendant came to Balonie's house in New Roads and asked him to come take a ride with him in his "old lady's car." A couple of days later, he saw defendant in the car again. Defendant picked him up, and the two went to Balonie's house. Subsequently Balonie, defendant and James Victorian, Jr., went together in the same car to Batchelor, Louisiana. On this occasion, defendant and Victorian went on the levee and switched seats from each other's car. He identified a photograph of the car recovered from the "bar pit" as depicting the car that defendant was driving.
James Victorian, Jr., viewed the same photograph and recognized it as depicting the car that had been parked in front of his house. Balonie and defendant were sitting in front of the house when he went outside and talked to them. Defendant asked him if he would like to buy some car seats. Victorian testified that he purchased the seats for thirty dollars, and he and defendant switched seats on the way to Batchelor. Victorian also identified State photographs of the interior of the car recovered from the "bar pit" as photographs showing the seats that had been in his own car.
Defendant denied ever having taken the stolen car to Balonie's house or ever giving him a ride in the car. He testified that he did not switch car seats with Victorian. He witnessed the switching of the seats but claimed that "Duck" had done that when he, Balonie, and "Duck" were on their way to his mother's house. "Duck" changed seats in the Cutlass with those from a burgundy Fury. He further testified that he had no idea why his brother's (Ronnie Brown's) registration papers for the Ford Torino were found inside the car recovered from the "bar pit."
*683 II. ASSIGNMENTS OF ERROR
Because defendant has urged so many assignments of error, many of which are topically connected, we will deal with them in related groupings. Assignments of error one, five, six and eleven were not briefed on appeal and are, therefore, considered abandoned.
ASSIGNMENTS OF ERROR NOS. 2, 4 AND 12:
By means of these assignments, defendant asserts that the trial court erred during trial by allowing testimony regarding oral statements made by him and his taped statement admitted into evidence and erred by denying his pretrial motion to suppress his taped statement.
Although defendant indicated in his consolidated arguments on these assignments that he was addressing his second assignment, that is, an alleged error by the trial court in allowing testimony at trial relating to the defendant's March 11, 1984, oral statement, he actually dealt with only numbers 4 and 12 regarding his taped statement. Since his second assignment was not briefed, it is considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4. In his brief, defendant alleges that his taped confession was not freely and voluntarily made, having been induced by police promises to "... help appellant with his bond and get him only a six month sentence." Defendant argues that the state did not meet its burden of proving the voluntariness of the confession beyond a reasonable doubt. Defendant concludes that the trial court therefore erred in admitting the taped confession into evidence.
At the hearing on defendant's motion to suppress, the state presented the testimony of Baton Rouge Police Detective Steve Woodring and defendant presented his testimony.
Detective Woodring testified that on March 15, he advised defendant of his Miranda rights before defendant gave his taped confession. He was alone with defendant at the time of the confession. Defendant indicated he understood his rights and indicated his willingness to waive those rights and answer questions. Neither he nor any other police officer made any threats, or used any force or violence upon defendant to obtain the waiver of constitutional rights or the confession. He testified that he was not aware of any promises having been made to defendant concerning a reduction of the charge. Detective Woodring testified that he did nothing, other than advise defendant of his rights, in order to secure the waiver of rights, responses to his questions, or the statement itself. Detective Woodring positively denied that defendant had been provided a prepared statement in the process of recording the taped confession and testified that the taped confession had been made by defendant from his memory.
On cross-examination, Detective Woodring testified that he did not know for a fact whether or not any police officers other than Detective Phares talked to defendant during the period prior to March 15, but if someone had removed defendant from the downtown jail it would be reflected in the central booking sign-out log. The defense introduced a copy of the pertinent page of the log in evidence at the motion to suppress hearing, which reflected that defendant had been removed from his cell only two times, viz., March 14 by Detective Phares[1] for the period 2:20-3:40 *684 p.m., and March 15 by Detective Woodring for the period 12:00-2:00 p.m.
Defendant gave a confusing and contradictory account of his version of the circumstances surrounding his taped confession. He testified that Baton Rouge Police Detective Greg Phares talked to him at the downtown jail prior to March 15, 1985, but had made no promises to him. When asked on direct examination if he had seen any other persons prior to March 15, he responded that he had seen the "headman of armed robbery," who threatened defendant would "get some time" if he did not "communicate." Defendant was then allegedly promised help with breaking down his bond and reducing his sentence, so that he would "come back maybe with six months." Defendant then stated this testimony related to March 15, 1984, and that prior to that date, the "headman of armed robbery" told him if defendant would make a taped statement that the "headman" would "go to the judge and D.A.," who would see that [defendant] made bond and got home after about 6 months. On cross-examination, when defendant was asked again when he saw the headman, he responded only, "On the 15th."
In order for a confession to be admissible into evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La.R.S. 15:451. Confessions obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, are involuntary and inadmissible as a matter of constitutional law. The state has the burden of affirmatively proving the confession was free and voluntary. The general rule is that, on trial of a motion to suppress, the burden of proof is on the defendant to prove the grounds of his motion. La.C. Cr.P. art. 703(D). One exception to the rule is that the state has the burden of proving beyond a reasonable doubt the voluntariness of a confession which the defendant has moved to suppress as evidence at the trial on the merits. State v. Rodrigue, 409 So.2d 556 (La.1982). Therefore, if the defendant alleges police misconduct in eliciting a confession, it is incumbent upon the state to rebut these allegations specifically. State v. Welch, 448 So.2d 705 (La.App. 1st Cir.1984), writ denied, 450 So.2d 952 (La.1984).
The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility will not be overturned on appeal unless they are not supported by the evidence. State v. Jackson, 381 So.2d 485 (La.1980); State v. Welch, supra. In reviewing the trial judge's ruling as to the admissibility of a confession, his conclusions on credibility are entitled to the respect due those made by one who saw the witnesses and heard them testify. State v. Rodrigue, supra.
Upon careful review of the evidence presented at the motion to suppress hearing, we find that the trial court's denial of the motion to suppress is supported by the evidence. The version of events given by Detective Woodring shows that the taped confession made by defendant was made freely and voluntarily and not induced by threats, promises or coercion and defendant had been properly given his Miranda rights.
Having found that defendant's motion to suppress was correctly denied by the trial court, we find that ruling effectively rendered defendant's taped confession admissible at trial. See La.C.Cr.P. art. 703(F). When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state must, prior to presenting the confession or statement to the jury, introduce evidence concerning the circumstances surrounding the *685 making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement. La.C.Cr.P. art. 703(G). Herein, we find that the state met its burden of introducing evidence as required by La.C.Cr.P. art. 703(G) through the trial testimony of Detectives Woodring, Ryan, and Phares.
Accordingly, these assignments are without merit.
ASSIGNMENT OF ERROR NUMBER 3:
By means of this assigned error, defendant asserts that the trial court erred when it allowed the photographic lineup admitted into evidence. We note that the photographic lineup consisted of six frontal view black-and-white photographs of young black men of apparently similar appearance. Defendant argues that the lineup was suggestive, and displayed him in such a way as to focus Lloyd Lambert's attention to him, because the other men in the lineup had closer cropped hair than defendant.
In State v. Green, 471 So.2d 1049, 1052 (La.App. 1st Cir.1985) this Court stated:
Several factors must be considered in determining the constitutionality of an out-of-court identification. First, an evaluation must be made of the suggestiveness of the identification procedure. State v. Guillot, 353 So.2d 1005 (La. 1977) [,] writ denied, 367 So.2d 864 (La. 1979). If a witness' attention is focused on defendant during the lineup, the identification procedure is unduly suggestive. State v. Robinson, 386 So.2d 1374 (La. 1980). In reviewing the procedure, the trial court must look at the totality of the circumstances surrounding the identification. State v. Marchese, 430 So.2d 1303 (La.App. 1st Cir.1983).
Detective Woodring testified at trial that he prepared the photo lineup which he displayed to Lambert on March 10, following the incident. He testified that he presented the photo lineup to Lambert at one time, and he did not in any way suggest to Lambert a person that he was to identify. Lambert indicated his choice by signing his name beneath defendant's picture. Detective Woodring told Lambert that the photographs were black and white, some were old, and he should concentrate on facial features and not hair styles or "things" that could be altered. Lambert testified that a few days after the incident, the police showed him the photo lineup and from the six photographs he indicated his choice of the man who robbed him. He also made an in-court identification of defendant as the robber.
After viewing the photo lineup itself, and carefully considering the testimony of Detective Woodring and Lloyd Lambert, we find that the identification procedure herein was not unduly suggestive.
Furthermore, even assuming arguendo that the identification was suggestive, such will not result in reversal of a conviction if it is demonstrated that the identification was reliable. See State v. Lucky, 453 So.2d 1234 (La.App. 1st Cir.1984), writ not considered, 459 So.2d 529 (La.1984). The factors to be used in determining reliability include: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the description, (4) the witness' level of certainty, and (5) the time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Lucky, supra.
Applying the Manson analysis to the instant case, we find that the out-of-court identification was reliable and Lambert's in-court identification of defendant had an independent basis.
The record shows that defendant approached Lambert as a potential customer asking to test drive the car. Defendant drove the vehicle with Lambert as a passenger, sitting to his right. The incident occurred in daylight, at approximately 3:00-4:00 p.m. The test drive consisted of a very extended amount of driving, affording Lambert ample opportunity to view defendant. Lambert distinctly remembered a scar on defendant's neck. The out-of-court *686 identification was made on March 10, five days following the incident. Approximately eight months elapsed between the incident and the in-court identification. Both the in-court and out-of-court identifications were positive and unequivocal. In view of these facts, the out-of-court identification was clearly reliable, rendering the photo lineup admissible in evidence; and the in-court identification had an independent basis.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER 7:
By means of this assignment, defendant alleges that the trial court erred when it allowed the state to read from the Louisiana Criminal Code to a witness.
During cross-examination, defense witness, Leo Balonie, Jr., testified that, on the day after the instant offense, defendant asked him to take a ride in his "old lady's car." The state then asked: "And what kind of car was that?" Balonie responded that he could not recall because he was "half way `toxicated'" at that time. Then the following exchange occurred:
Q. Did you ever give a statement to anyone from the Sheriff's Office in New Roads on April 12th, 1984,uh indicating what kind of car it was?
A. No.
Q. You never did?
A. No.
Q. You never told them what it was?
A. No.
Q. Let me read you a statute before we proceed further. Article 123 of the Criminal Code state's [sic]
MR. JONES: Your Honor, I object to any reading of any law to the witness by the state unless IuhI thought he was cross examining himuhand I don't understand the reading of a provision of the Criminal Code in the scope of his cross examination.
THE COURT: Objection is overruled.
(TR. 256-257)
After the defense's objection was overruled, the prosecution read the provisions of La.R.S. 14:123, the perjury statute, to Balonie and then redirected Balonie's attention to the prior question relating to whether the witness had made a statement to the sheriff's office in New Roads indicating what kind of vehicle defendant had. Balonie responded: "I didn't understand when you asked mebut when Wayne Brown came in the car I didn't know what kind of car it was. The police picked me up about a week or two weeks after. Then I started to hearing about the car." (R.257-258)
In brief, defendant argues grounds not articulated to the trial court and argued for the first time on appeal. He argues that La.R.S. 15:493 sets forth the proper foundation required to impeach a witness because of a prior inconsistent statement and that the prosecutor was testifying that a prior inconsistent statement had been made. Alternatively, defendant claims that the state was assuming a fact not proven, contrary to the provisions of La.R.S. 15:278. Defendant asserts that La.C.Cr.P. art. 771 permits a mistrial when a remark is of such a nature that it might create prejudice in the mind of the jury. Without having urged any of the foregoing grounds to the trial court, defendant further argues in brief that he was prejudiced when the trial court allowed the prosecutor to improperly suggest before the jury that perjury had been committed. He asserts that the trial court should have required a showing of a prior inconsistent statement, thereby giving Balonie an opportunity to explain any contradiction. He concludes that the testimony of Balonie was discredited to the jury without the required factual basis therefor.
It is well settled that defense counsel must state the basis for his objection when making it and point out the specific error which the trial court is making. La. C.Cr.P. art. 841; State v. Williams, 374 So.2d 1215 (La.1979). The grounds of objection must be sufficiently brought to the attention of the trial judge to allow him the opportunity to make the proper ruling and correct any claimed prejudice. State v. Harris, 414 So.2d 325 (La.1982). A defendant is limited on appeal to grounds for *687 objection articulated at trial. A new basis for objection, albeit meritorious, cannot be raised for the first time on appeal. State v. Clayton, 427 So.2d 827 (La.1982).
Since the grounds argued in brief herein were not properly raised at the time of objection before the trial court, they are not properly before this Court on appeal.
Moreover, contrary to defendant's assertions, we find that, prior to the prosecutor's statement to Balonie that he would read to him from article 123 of the Criminal Code, the prosecutor complied with the requirements set forth in La.R.S. 15:493[2] for impeachment of a witness. He did so by asking Balonie whether he made the alleged prior inconsistent statement, calling his attention to the time, place and circumstances and to whom the alleged statement was made.
In State v. Spotville, 308 So.2d 763 (La. 1975), the defendant contended that the prosecutor should not have been permitted to read the perjury statute to a witness in the presence of the jury. The Supreme Court stated at page 766:
Perhaps a preferable procedure would have been to have the statute read to the witness outside the presence of the jury. Defendant, however, did not make this request at trial. And even if we were to be concerned that the prosecutor was badgering the witness or implying to the jury that he should not be believed, we would still be inclined to find no prejudice accruing to the defendant. The trial court had already determined that the State could impeach the credibility of its witness by showing prior inconsistent statements, and the State had proceeded to do so. Any possible discrediting of the witness, by reading the perjury statute to him added nothing to what the State was already attempting to do by leading questions relative to a prior inconsistent statement.
As was concluded in Spotville, we find that defendant suffered no prejudice from the prosecutor's reading of the perjury statute to Balonie. Herein, as in Spotville, the state had already begun impeaching the witness by a prior inconsistent statement; and the possible discrediting of the witness added nothing to what the state had already done by beginning impeachment of the witness. Additionally, the record does not reflect that Balonie was intimidated by the conduct of the prosecutor. See State v. Selmon, 343 So.2d 720 (La.1977); State v. Muse, 363 So.2d 462 (La.1978), appeal dismissed, 441 U.S. 929, 99 S.Ct. 2046, 60 L.Ed.2d 657 (1979).
This assignment is meritless.
ASSIGNMENT OF ERROR NUMBER 8:
Defendant alleges that the trial court erred in refusing to grant his motion for a new trial, in regard to: 1) a preexisting relationship between Fred S. Ladner, Jr., a juror, and Brett Grayson, the prosecutor, which was not disclosed during voir dire and 2) a conversation between Grayson and Ladner which occurred in the presence of another juror during a lunch recess at trial.
During voir dire examination of the jury venire of thirty-six persons called to serve in the instant case, the trial court announced that Mr. Brett Grayson, assistant district attorney, was prosecuting the case for the state. The trial court then asked: "Is anyone personally acquainted with Mr. Grayson or has he represented them as an attorney in a private matter?" The record reflects that there was no response to the question.
On the second day of trial, following a lunch recess, out of the presence of the jury, defense counsel made a motion to the trial court, disclosing that during the recess *688 he had walked into the courtroom and had observed the prosecutor and two of the jurors having a discussion. Defense counsel stated that he did not know the basis of the discussion and he was not suggesting there was any impropriety involved or that they were discussing the case, but he objected to any such conversations during trial. The two jurors were then determined to have been Messrs. Ladner and Ferrara. The trial court asked defense counsel whether he wanted to poll all the jurors, and defense counsel responded that he only wanted to poll Messrs. Ladner and Ferrara. Defense counsel stated that he just wanted to put it on the record as to what occurred. The trial court stated that it had to take proper precaution and asked defense counsel whether he was asking for a mistrial. Defense counsel stated that he was not.
At this point, the two jurors were brought into the courtroom for polling as follows:
THE COURT: You all can have a seat. Counsel for the defense has asked me to poll Mr. Ferrara and Mr. Ladner as to the nature of the conversation at the lunch recess between the prosecutor and the two jurors. He has alleged no improprieties or anything else. But once the inquiry is made I am bound by law to have you polled as to the nature of the conversation as to whether it was involving any of the facts of the case or anything. Mr. Ladner, first.
MR. LADNER: We started a conversation about the armythe army reserve. That was what we discussed as far [as] I know.
THE COURT: That would not influence your ability to sit as a fair and impartial juror?
MR. LADNER: Oh, no.
THE COURT: Mr. Ferrara, the alternate?
MR. FERRARA: I was just listening to the conversation.
THE COURT: You were just standing there?
MR. FERRARA: They were talking about the Army National Guard.
THE COURT: Okay. Any questions.
MR. JONES: No, sir.
THE COURT: Thank you. You can bring in the rest of them.
(TR. 136-137)
Later during jury deliberations, Ladner, as jury foreman, requested additional instructions following the jury's inability to reach a verdict. Ladner explained that the jury had voted several times and several jurors had not voted for any of the responsive verdicts. He explained that some members of the jury apparently felt that, since they did not see the crime committed, they could not vote. Ladner explained that he would like the trial court's direction as to whether the jurors should vote one way or the other based on the evidence. The trial court then provided needed instructions to the members of the jury.
At the hearing on defendant's motion for new trial, Ladner testified that he did not respond to the trial judge's question during voir dire as to whether or not he knew Grayson because, at the time, he was not aware that he knew Grayson.
Ladner testified that, at the trial during a lunch break, he, Grayson and another gentleman had a conversation in the courtroom. He thought that Grayson spoke to him and mentioned something about the army reserve as Ladner was coming through the door, and they started talking. Grayson told him that he had served in his reserve unit several years before. They talked only about the military reserve and not about the instant case at all.
Ladner further testified that he was in the reserve from 1956 to 1981 and did not recall his rank or that of Grayson at the time of Grayson's service in the reserve. When asked how often he might have come in contact with Grayson during the time Grayson served in Ladner's reserve unit, Ladner responded that he did not know but at a regular drill he might not have even seen Grayson. He was not sure whether or not Grayson attended any of the summer camps. Ladner testified that he had no social relationship with Grayson. He *689 thought that Grayson recognized him rather than vice versa. Ladner further testified that the fact that he eventually recognized Grayson had nothing to do with the way he voted or served on the jury. He did not in any manner try to influence the vote of any of the jurors because of his relationship with Grayson. Ladner acknowledged that, when he was polled at trial following the lunch recess with Grayson, he did not inform the trial court that he knew Grayson, but commented that he had not been asked.
Ladner testified that he was subsequently selected by the other members of the jury as foreman. Defense counsel asked him if it were not true that jurors initially were not able to agree on a verdict. He then answered affirmatively and explained that the reason was that some jurors said they were not going to vote because they did not see the incident. The court then had given further instructions, and the jury returned a guilty verdict.
In ruling on the motion for new trial, the trial court found there was no defect in the trial proceedings and denied the motion. The court cited from the record that, at the time Ladner was questioned at trial regarding the lunch recess conversation, the court asked if there were any questions and defense counsel answered no. The trial court noted that there was no contemporaneous objection to its ruling at trial as to Ladner's ability to be a fair and impartial juror, and no mistrial was requested (although the evidence to sustain such a motion was lacking). The trial court noted that no one asked Ladner whether he liked Grayson, further noting that he might not have liked him. The trial court stated that the record indicates Ladner made no false statements and there is nothing in the record to indicate that this man could be anything other than fair and impartial.
The trial court is not required to grant a motion for new trial when no injustice is shown to have been done to the defendant. La.C.Cr.P. art. 851. Further, the trial court's denial of the motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Collins, 470 So.2d 553 (La.App. 1st Cir.1985).
In Mattox v. United States, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), the Supreme Court set forth the following standard: "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."
We find no abuse of discretion in the trial court's denial of the motion for new trial in the instant case. We agree with the trial court's findings that the record indicates Ladner made no false statements and that there is nothing in the record indicating Ladner was anything other than a fair and impartial juror.
We note that the record does not disclose whether or not the prosecutor recognized Ladner prior to his selection as a juror. The record does, however, show that he did so at the lunch recess during trial when the conversation occurred between the two of them.
In the instant circumstances we are convinced that defendant suffered no prejudice under the facts presented. We find that defendant's constitutional rights to due process of law and to trial before a fair and impartial jury were not violated under the instant facts. We find that the conversation was casual in nature and any possible effect was harmless.
Ladner's testimony, at the hearing on the motion for new trial, clearly established that the prior relationship between him and the prosecutor, which occurred several years before the trial, was extremely tenuous, that no social relationship between the two existed, and that Ladner had not even recognized the prosecutor until being approached by him. Additionally, the conversation itself did not relate to the case.
During the trial, upon being polled by the court, Ladner indicated that the conversation related to the army reserve, and stated that the conversation would not influence his ability to sit as a fair and impartial *690 juror. Additionally, at the hearing on the motion for new trial, Ladner stated that the fact that he eventually recognized Grayson had no effect on his jury service or the way he voted as a juror. He further testified that he did not try to influence the vote of the other jurors because of his relationship with Grayson.
Contrary to defendant's assertion, the record indicates that the initial inability of the jury to reach a verdict was clearly unrelated to the relationship between Ladner and Grayson. That inability was obviously the result of a misunderstanding of the law on the part of some members of the jury, which was eliminated by proper additional jury instructions by the trial court.
This assignment is without merit.
ASSIGNMENT OF ERROR NUMBER 9:
By means of this assignment, defendant asserts that the trial court erred by denying his motion for post verdict judgment of acquittal. Defendant argues that the state failed to prove a required element of armed robbery, i.e. that the robber was armed with a dangerous weapon. Defendant contends that the only evidence proving said element of the crime was the testimony of Lloyd Lambert, the victim. He further argues that, since Lambert testified that he would have given up the car even if the robber was unarmed, doubt is cast on the only evidence that shows the thief was armed.
The standard by which we review a trial judge's denial of a post verdict motion of acquittal is found in La.C.Cr.P. art. 821, which requires that the evidence adduced at trial be viewed in the light most favorable to the prosecution. The trial judge's ruling will be upheld if we determine that any rational trier of fact (the jury) could have found that the elements of the crime of armed robbery were proven beyond a reasonable doubt. See State v. Williams, 464 So.2d 443 (La.App. 1st Cir.1985).
Initially, we note that defendant errs when he argues that the victim's testimony constituted the only evidence that the robber was armed with a dangerous weapon. In defendant's taped confession, he admitted that he pulled a knife on the victim and told him to get out of the car.
Even assuming arguendo that defendant had not confessed to having used a knife in the commission of the instant offense, the state need not introduce in evidence the dangerous weapon used during the commission of an armed robbery. The victim's testimony can sufficiently establish a robbery was committed with a dangerous weapon. See State v. Rash, 444 So.2d 1204 (La.1984); State v. Sterling, 453 So.2d 625 (La.App. 1st Cir. 1984). Herein, the testimony of Lambert, the victim, sufficiently establishes that defendant pulled a knife having a six- or seven-inch blade, and ordered Lambert to get out of the car. The fact that Lambert testified that defendant did not have to pull the knife to get the car does not alter the fact that the knife used by defendant constituted a dangerous weapon. See La.R.S. 14:2(3).
The evidence of record is clearly sufficient to support the jury's verdict.
This assignment is without merit.
ASSIGNMENT OF ERROR NUMBER 10:
By means of this assignment, defendant alleges that the trial court erred by imposing an excessive sentence. Defendant argues that the trial judge failed to consider a single mitigating factor and did not individualize his sentence.
Article 1, Section 20 of the Louisiana Constitution prohibits the imposition by law of excessive punishments. Further, the jurisprudence reflects that a sentence may violate a defendant's constitutional right against excessive punishment even though the sentence is within its statutory limits. State v. Jones, 412 So.2d 1051 (La.1982).
The trial court is given wide discretion in the imposition of sentences within the statutory limits. For this reason, a sentence should not be set aside as excessive absent a manifest abuse of discretion. State v. Washington, 414 So.2d 313 (La.1982).
*691 A sentence will be considered excessive if it is grossly out of proportion to the severity of the crime, or if it is nothing more than the purposeless and needless imposition of pain and suffering. State v. Sims, 410 So.2d 1082 (La.1982). To determine if a sentence is grossly disproportionate, the court must consider the punishment and the crime in light of the harm to society and determine whether the penalty is so disproportionate that it shocks our sense of justice. State v. Pearson, 425 So.2d 704 (La.1982).
In State v. Benton, 453 So.2d 993 (La.App. 1st Cir.1984), writ denied, 457 So.2d 17 (La.1984), we noted that La.C. Cr.P. art. 894.1 requires the trial court to state for the record the considerations and factual basis for imposing the given sentence. However, it need not articulate every aggravating and mitigating circumstance. The record need only reflect that the trial judge adequately considered the guidelines given in this article. State v. Parish, 429 So.2d 442 (La.1983). Even when the trial court has not complied with La.C.Cr.P. art. 894.1, this court need not remand the case for resentencing, unless the sentence imposed is apparently severe in relation to the particular offender or the offense committed. State v. Davis, 448 So.2d 645 (La.1984).
The crime of armed robbery is punishable by imprisonment at hard labor for not less than five years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence. La.R.S. 14:64(B). Herein, defendant received a sentence of twenty-five years at hard labor, without benefit of parole, probation or suspension of sentence, which is less than one third the maximum for the offense.
The record indicated that the trial court adequately complied with the guidelines of La.C.Cr.P. art. 894.1.
The trial judge noted that defendant had been arrested on a charge of carnal knowledge, which was pending at the time of the defendant's arrest on the instant offense, as well as having been convicted of issuing worthless checks. Defendant had been placed on supervised probation and had been a poor probation case, avoiding supervision whenever possible. The judge further noted that defendant had been convicted of felony theft and had been placed on probation therefor, which he subsequently violated necessitating a warrant for his arrest. Moreover, in regard to the pre-sentence investigation ordered in the instant case, the interview by the probation and parole personnel had to be terminated shortly after defendant became violent. It was the trial judge's stated opinion that there was an undue risk that during a period of probationary sentence, defendant would commit another crime. The judge also noted that defendant is in need of correctional treatment and a custodial environment that can be provided most effectively by his commitment to an institution and that a lesser sentence would deprecate the seriousness of the crime.
Under these circumstances, the sentence imposed was clearly not excessive. The trial judge fully considered the range of sentencing alternatives and individualized the sentence to defendant for the crime for which he was convicted.
This assignment therefore lacks merit.
For all of these reasons, we find that defendant's conviction and sentence must be affirmed.
AFFIRMED.
NOTES
[1] In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La.1979); State v. Fleming, 457 So.2d 1232, 1235 n. 3, (La.App. 1st Cir.1984), writ denied, 462 So.2d 191 (La.1984). Although the evidence given at trial in the instant case does not affect the result we reach based upon the evidence introduced at the suppression hearing, we do note that at trial, defendant identified Lt. Alford of the Baton Rouge Police Dept. as the individual he had referred to as the "headman of armed robbery". However, when Lt. Alford was called to the stand at trial, as a defense witness, he testified that he had not discussed the instant offense with defendant and had made no promise to defendant in regard to a reduction of the offense or seeking to aid defendant in not being prosecuted. Additionally, Detective Phares testified at trial that he had talked to defendant on only one occasion and during that interview defendant remained in his presence the entire time, and no promises were made to defendant by Lt. Alford or any other person during that time.
[2] La.R.S. 15:493 provides as follows:

Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible.