577 So.2d 134 (1991)
STATE of Louisiana
v.
Darrell LEE.
No. KA89-1489.
Court of Appeal of Louisiana, First Circuit.
March 5, 1991.
Writ Denied May 24, 1991.
*135 John L. Stone, III, Asst. Dist. Atty., Greensburg, Duncan Kemp, Dist. Atty., Livingston, for plaintiff.
Michael L. Thiel, Hammond, for defendant.
Before SAVOIE, CRAIN and FOIL, JJ.
SAVOIE, J.
Defendant was initially indicted in indictment number 5545 for the first degree murder of Otto Kennard, a violation of LSA-R.S. 14:30. The indictment was later amended to a reduced charge of second degree murder, a violation of LSA-R.S. 14:30.1. At a first trial on this reduced charge, the trial ended in a mistrial when the jury was unable to reach a verdict. Thereafter, defendant was indicted in a new indictment (number 6965) for first degree murder.[1] Defendant was tried on this charge at a second trial; and, at this trial, the jury found defendant guilty of the responsive offense of second degree murder. See LSA-C.Cr.P. art. 814 A 1. The trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant has appealed, urging eleven assignments of error:
1. Defendant was denied his Sixth Amendment right to a speedy trial.
2. The trial court erred by recusing defendant's initial defense attorney.
3. The trial court erred by denying defendant's motion to suppress recorded inculpatory statements.
4. The trial court erred by denying defendant's motion to suppress unrecorded oral inculpatory statements.
5. The trial court erred by denying defendant's motion to suppress the alleged murder weapon.
6. The trial court erred by allowing the jury to hear the tape recording of defendant's alleged confession without requiring the prosecution to establish the proper chain of custody.
7. The trial court erred by allowing the jury to review the transcript of defendant's alleged confession during the playing of the tape recording.
8. The trial court erred by refusing to allow the testimony of Detective Cowart with respect to his knowledge of the statements made by defendant.
9. The trial court erred by refusing to grant defendant's motion for mistrial on the basis of prejudicial statements made by state witnesses relating to a previous trial.
10. The trial court erred by denying defendant's motion for mistrial on the basis of improper assignment of the instant case in violation of local court rules.
11. The jury's verdict is contrary to the evidence introduced at trial.[2]
*136 In brief, defendant expressly abandoned assignments of error numbers two and six through eleven.
The record reflects that the victim, who was about fifty-three years old, lived alone at his residence in Watson, Louisiana. On November 14, 1984, at about 10:30 a.m., John Kennard, the victim's brother, went to the victim's home to visit his brother. However, when John did not see Otto's truck at the residence, he assumed Otto was not at home; and, thus, John drove past his brother's home. John then went to his own home, which was located nearby. After learning that his brother's truck was in a repair shop and after receiving only a busy signal when he made several telephone calls to the victim's residence, John walked to his brother's residence. When he arrived there, John walked in, as he usually did, and called out to his brother; but he received no answer. John then walked into the living room, where he found Otto's lifeless body lying on the floor in a pool of blood. Instead of using the victim's telephone, which had its receiver off the hook, John went to another location, where he telephoned the police and summoned an ambulance. John then returned to the victim's house, where he waited for the authorities who came within a few minutes.
An autopsy was performed on the victim's body that same day. It disclosed that the victim died as a result of a single gunshot which inflicted an entrance wound to the victim's right chest and an exit wound on the right side of the victim's back. According to Dr. George William Sickel (who performed the autopsy and who qualified and was accepted by the trial court as an expert in the field of medicine with a specialty in pathology), the wounds were consistent with those from a .38 caliber cartridge.
The investigating officers from the Livingston Parish Sheriff's Office and Jim Churchman from the Louisiana State Police Crime Laboratory, who went to the victim's home on November 14, looked around the victim's home for the bullet which had inflicted the victim's wounds; but they failed to find a bullet on November 14. Later, on November 19, 1984, a .38 caliber bullet was found on the floor in a back bedroom of the victim's house between the wall and two pieces of plywood that were leaning against the wall.
During the ensuing criminal investigation, Dwight Stacey Lee, defendant's brother, became a suspect in regard to the instant offense on about December 5, 1984, when he admitted to Livingston Parish Sheriff's Detective Donald Cowart that he had stolen a .38 caliber revolver from a pickup truck belonging to Percy Easterly. Rather than arrest defendant on December 5, Cowart allowed Dwight several days to determine if he could locate the stolen weapon and, if it could be located, to bring it to the Sheriff's Office. On December 10, at about 12:00 to 12:30 a.m., Dwight came into the sheriff's office. He informed Livingston Parish Sheriff's Detective Edward Paul Jeansonne that he had been unable to locate the weapon. Jeansonne then arrested Dwight for the burglary and advised him of his Miranda rights. Dwight was asked to submit to a polygraph test, and he agreed to the request.
The polygraph test concerned the instant offense and was administered to Dwight by a polygraph examiner in Baton Rouge. The results of the test reflected that Dwight had not committed the instant offense but that he had lied concerning his lack of knowledge of the offense. After the administration of the test, the police brought Dwight back to the sheriff's office at about 5:30 p.m. on December 10.
Following his return to the sheriff's office, Dwight was questioned about the instant offense. He began crying and requested the presence of his father, James Willie Lee. In accordance with Livingston Parish Sheriff Odom Graves' instructions, Livingston Parish Sheriff's Detectives Hollis B. Haley and Jeansonne brought Dwight's father to the sheriff's office that same evening. At that time, in the presence *137 of his father, Dwight was further questioned by the officers. Dwight began crying and stated that defendant had committed the instant offense, but that he thought the killing was accidental.
At that point, Detectives Hollis B. Haley and Jeansonne and defendant's father went to Watson, where the officers took defendant into custody. At that moment, i.e., when defendant was placed in their police unit, Haley advised defendant of his constitutional rights and informed him that the officers wanted to talk to him about the Otto Kennard homicide. The officers then drove to the sheriff's office with defendant and his father in their police unit. Shortly after their arrival at the sheriff's office on the evening of December 10, Haley again advised defendant of his constitutional rights; and, at 6:42 p.m. in connection with this advice of rights, defendant signed the advice of rights portion of S-14 (a form consisting of two portions, i.e., an advice of rights portion and a consent to questioning portion). Haley and Jeansonne both testified that defendant was not being questioned at the time S-14 was executed and that was the reason they did not ask defendant to sign the consent to questioning portion of the form. Defendant remained at the sheriff's office until he was taken to the Livingston Parish Prison at about 7:30 p.m. that same evening. At the prison, defendant was brought into a conference room where he remained until booking procedures were completed; and he was placed in a cell housing the adult male inmates at about 10:00 to 10:30.
On December 11, the following morning, defendant was brought from his prison cell to Detectives Cowart and Jeansonne. They questioned defendant at the parish prison after Cowart read defendant his constitutional rights and defendant signed both portions of S-19, an advice of rights and consent to questioning form at 1:30 a.m. that morning. When Cowart and Jeansonne questioned defendant about the instant offense, defendant stated that he did not know what the officers were talking about. Cowart and Jeansonne then left the interview room. Livingston Parish Sheriff's Chief Criminal Deputy Willie Graves and Livingston Parish Sheriff's Detective Kearney Foster were the next officers who went into the interview room with defendant. During their questioning of defendant, defendant admitted that he commited the instant offense and agreed to give a tape-recorded statement. The tape-recorded confession (S-23) which defendant made lasted about eleven minutes. It began at approximately 1:43 a.m. and ended at about 1:54 a.m.
Defendant's tape-recorded confession revealed the following. On November 14, 1984, between 9:00 to 10:00 a.m., defendant went to the victim's house, which was located a short distance from where defendant lived. At the time, defendant had a .38 caliber pistol in his pocket. He did not personally know the victim and did not think that the victim knew him. When defendant got to the victim's house, he noticed that the victim's truck was not there. Thinking that the victim was not at home, he opened the front door of the victim's residence and was surprised when he saw the victim in the living room holding a cup of coffee in his hand. The victim asked defendant what he wanted. Defendant, who was holding the gun in his hand by his side, told the victim to put the coffee down. The victim complied. At that time, defendant was holding the gun on the victim. Defendant told the victim that he wanted the victim's wallet. The victim gave it to defendant. Defendant told the victim to go to the backroom, lie down and not get up until he left. Defendant put the wallet in his jacket pocket and began taking a few steps backward. As defendant proceeded to turn around and was about to put his gun into his pocket, he heard noise from the hard soled shoes the victim was wearing as the victim rushed toward him. Defendant panicked, turned around, shot (without knowing whether or not he had hit the victim) and ran to his house. When he got home and looked through the victim's wallet, he learned that it contained $175.00. He burned the wallet that same day. About two weeks before the tape-recorded confession, defendant threw the gun he had used into a lake. Defendant concluded *138 his confession by saying that he was the only perpetrator of the instant offense and that he had told only one other person, his brother Dwight, that he had committed the instant offense.
After defendant gave the tape-recorded confession to the officers, they asked if he would return to the crime scene with them and show them where the events had taken place. Defendant agreed to this request. When they got to the scene during the early pre-dawn hours of December 11, defendant reenacted the crime.[3] The officers stayed there with defendant about forty-five minutes to an hour. Some of the officers then took defendant to the lake or pond east of the Amite River in Livingston Parish, where he had thrown the murder weapon; and defendant pointed out where the gun had been thrown. Defendant was then taken back to the parish prison. Later, on the afternoon of December 11, the gun was recovered from the lake or pond. At 9:15 a.m. on December 12, 1984, defendant executed another advice of rights and consent to questioning form (S-22).[4] Defendant then looked at and identified the gun which had been recovered the previous day as the one he had used during the instant offense.

ASSIGNMENT OF ERROR NO. ONE:
In this assignment, defendant asserts that the trial court erred by denying his motion to quash indictment number 6965 based on a denial of his Sixth Amendment right to a speedy trial.
The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and by Article I, § 16, of our state constitution. The right attaches when an individual becomes an accused whether by formal indictment or bill of information or by arrest and actual restraint. State v. Sweeney, 443 So.2d 522, 526 (La.1983). In determining whether or not this constitutional right has been violated, no fixed time period is determinative. Rather, a balancing process is utilized in which the conduct of both the prosecution and the defense is viewed in light of several factors: the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). See State v. Bodley, 394 So.2d 584, 594-595 (La.1981). The peculiar circumstances of the case will determine the weight to be ascribed to the length of the delay and the reasons for the delay. State v. Pleasant, 489 So.2d 1005, 1010 (La.App. 1st Cir.), writ denied, 493 So.2d 1218 (La. 1986).
The record reflects that defendant was arrested for the instant offense on December 10, 1984. Defendant filed a motion for speedy trial on December 28, 1984. The initial indictment number 5545 charging defendant with first degree murder was returned on February 20, 1985. Five days later, defendant appeared in court, accompanied by counsel from the office of the public defender. At that time, the public defender stated that he had advised defendant of his legal and constitutional rights. Defendant acknowledged that he was so advised, pled not guilty and informed the district court that he would employ an attorney to represent him. The district court set the date March 19, 1985, as the date defendant would next appear in court for purposes of furnishing the name of retained counsel. On March 19, 1985, the district court reappointed the office of the public defender to represent defendant. After defendant filed motions for discovery,[5] a preliminary examination and to *139 suppress physical evidence and/or his confession, and, pursuant to the state's April 29 motion, this case was set for trial to be held on August 19, 1985. Following transfers of the case from Division F to Division B and then to Division C of the district court, on May 20, 1985, the judge of Division C rescheduled this case for trial to be held on September 23, 1985. On June 19, 1985, defendant filed approximately twenty-eight pretrial motions, which included another motion for speedy trial and a motion to recuse the district judge presiding over Division C on the basis that defendant had previously appeared before the judge in a different criminal case and that, thus, the judge might be biased, prejudiced or personally interested in the instant case to an extent that he would be unable to conduct a fair trial in this matter. On June 26, 1985, the judge of Division C recused himself on the basis that he had previously sentenced defendant in another felony case and had revoked defendant's probation. The case was then transferred to Division A. On July 16, 1985, a hearing was held in regard to approximately eleven pretrial defense motions. On the following day, defendant filed several additional defense motions. On August 6 and 13, 1985, defendant filed motions for extension of time to file memoranda in support of several of his pre-trial motions. On August 13, 1985, defense counsel signed a district court order agreeing to a state motion allowing the state until September 30, 1985, to respond to defendant's memoranda and another defense motion for discovery.[6] A hearing was held on defense pretrial motions on August 27, 1985. At that time, the court granted a defense motion for excess subpoenas; scheduled November 19, 1985, as the date for questioning thirty prospective jurors in connection with defense motions for a change of venue; set March 11, 1986, as the hearing date for the outstanding defense pretrial motions; and rescheduled the trial for April 21, 1986. On March 11, 1986, the district court heard several defense motions, including defendant's motion to suppress physical evidence and/or confession, which the court granted in part and denied in part. Defendant filed an application for supervisory writs, seeking review of the adverse ruling on the motion to suppress. On April 22, 1986, under docket number KW 86 0468 of this Court, we denied the writ application on the basis that defendant had an adequate remedy on appeal in the event he was convicted;[7] on that same day, the district court granted defendant's motion to quash indictment number 5545, dismissing the amended charge of second degree murder on the basis that defendant's constitutional right to a speedy trial had been violated.[8] Later that same day, pursuant to the state's motion, the district court signed an order vacating and voiding its earlier ruling granting the motion to quash and decreeing that there would be a rehearing of the motion to quash on May 6, 1986. At a hearing on April 24, 1986, defense counsel objected to the court's issuance of the order vacating the ruling granting the motion to quash and setting the matter for a rehearing and stated for the record that he was presently prepared for trial and did not acquiesce in any continuance of the trial. At the May 6, 1986, rehearing on the motion to quash, defense counsel stipulated that the previously scheduled trial dates in September of 1985 and April of 1986 had been selected and acquiesced in by the state and the defense, noting his April 24, 1986, objection to continuance of the trial. At the conclusion of the May 6, 1986, rehearing, the district court reversed its April 22, 1986, ruling granting the motion to quash; and the case was rescheduled for trial to be held on June 16, 1986, the next available trial date; defendant asked leave of court *140 to apply for supervisory writs. On June 13, 1986, in KW 86 0703, this Court granted defendant's writ application insofar as the application sought review of the district court's ruling reversing its prior ruling granting the motion to quash. Citing State v. Spina, 261 La. 397, 259 So.2d 891 (La. 1972),[9] we held in KW 86 0703 that a judgment sustaining a motion to quash may not be reversed by the district court rendering that judgment. Consequently, by virtue of our decision in KW 86 0703, the district court's previous ruling granting defendant's motion to quash indictment number 5545 was left intact; and we noted that the state's proper remedy was to have appealed the ruling granting the motion to quash.[10] Subsequently, the state applied to this Court for a delayed appeal, which we granted. In that appeal (bearing docket number KA 86 0963 of this Court), in an unpublished opinion rendered on August 28, 1986, we reversed the district court's April 22, 1986, ruling granting the motion to quash indictment number 5545 and remanded the case for further proceedings. Following the remand, defendant's first trial in Division E for the second degree murder charged in indictment number 5545 began on October 27, 1986, and ended in a mistrial.
After the mistrial, indictment number 6965, charging defendant and his brother, Dwight Lee, with first degree murder, was returned by the grand jury on November 20, 1986.[11] On November 25, 1986, defendant entered a plea of not guilty to the indictment; the case was set for trial to be held on April 21, 1987. Defendant filed another motion for speedy trial on December 1, 1986. On January 6, 1987, defendant filed twenty-two pretrial motions; and, in response, the state filed twelve separate answers. A hearing on the motions which had been set for February 17, 1987, was continued to March 12,1987. On March 12, the district court held a hearing on the motions; the court issued rulings on the motions, denying some, granting some, taking some under advisement, and continuing others until the April 21, 1987, trial date. On April 21, after the trial court (on the preceding day) had denied defendant's motion to sever the trial of himself and co-defendant Dwight Lee, voir dire examination of prospective jurors began; and it was brought to the court's attention that a possible conflict of interest on the part of defendant's counsel existed, since he had previously represented (in other proceedings) two individuals that the state intended to call as witnesses at the trial. Consequently, on April 21, 1987, the trial court recused defendant's counsel, appointed new counsel to represent defendant and rescheduled the case for trial to be held on September 21, 1987. On June 26, 1987, new counsel for defendant filed a motion requesting that he be recused. The trial court denied the motion for recusal on July 6, 1987. This new counsel filed writ applications with this Court requesting a stay of the scheduled trial and review of the denial of the motion for recusal. After this Court consolidated and granted these writ applications on August 27, 1987, the trial court signed an order relieving defendant's new counsel of representing defendant in this case. On February 2, 1988, after another counsel was appointed to represent defendant and was recused because of a conflict *141 of interest, two counsels were appointed to represent defendant.[12] On March 14, 1988, on motion of the state, the trial was reset for April 18, 1988. Counsels for defendant filed several pretrial motions on April 17-19, 1988, including a motion to quash, alleging the denial of defendant's right to a speedy trial. Pursuant to the written motion for continuance filed by defendant's counsels on April 19, 1988, the trial was continued until July 12, 1988. After the trial court ruled on defense counsels' pretrial motions, defendant's second trial was held on July 12, 13 and 14, 1988.
In the instant case, the delay between defendant's December 10, 1984, arrest and his second trial on July 12-14, 1988, was approximately forty-three months. The delay between arrest and defendant's first aborted trial in October of 1986 was about twenty-two and one-half months, and there was a delay of about twenty and one-half months following the mistrial until the second trial.
The delay between arrest and the first trial was primarily the result of numerous defense motions and hearings necessitated by those motions. Also contributing to this period of delay were the following: several transfers of the case from one division of the district court to another, applications for supervisory writs filed by the defense, and the state's appeal of the lower court's ruling granting defendant's motion to quash indictment number 5545. There was only a short delay of about two months between our remand of the case on August 28, 1986, and the first trial.
After the mistrial, there was a brief period of delay of less than one month until the state succeeded in securing indictment number 6965, charging defendant and his brother with first degree murder. The remaining delay was primarily attributable to the defense. During the remaining period of delay, defense counsel filed another round of numerous pretrial motions, some of which were disposed of at a hearing before the next scheduled trial date (April 21, 1987), while others were continued until the scheduled trial. On that scheduled trial date, voir dire examination of prospective jurors began; however, this attempt to try defendant was aborted because of the recusal of defendant's counsel. Several successive appointments and withdrawals of new defense counsel followed until defense counsels who represented defendant at the second trial were appointed. Those defense counsels filed additional defense motions, and the second trial was further delayed by a continuance granted at the behest of those defense counsels.
The portion of the total delay attributable to the prosecution was slight. Furthermore, there was no showing that the state deliberately postponed the trial(s) of defendant in order to gain any tactical advantage over defendant. Finally, defendant does not allege any prejudice he might have incurred as a result of the delay. Of course, defendant was prejudiced to some extent, e.g., by living under a cloud of suspicion and anxiety. However, the record does not reveal any impairment of defendant's ability to prepare his case, the most serious form of prejudice normally experienced by an accused whose trial is delayed. See State v. James, 459 So.2d 1299, 1309 (La.App. 1st Cir.1984), writ denied, 463 So.2d 600 (La.1985). Defendant does allege that he was incarcerated from the time of his arrest (apparently continuously from that time). While the inconvenience of incarceration can be considerable, the mere fact that an accused remains imprisoned is not per se prejudicial; and in this case defendant has not shown that, as a result of his incarceration, he was prejudiced by being unable to effectively meet with and assist his attorney in preparation for trial. See State v. Brady, 524 So.2d 1356, 1359 (La.App. 1st Cir.), writ denied, 532 So.2d 175 (La.1988). Thus, after carefully employing the requisite balancing process in light of the four factors identified in Barker v. Wingo, together with other relevant circumstances peculiar to the instant *142 case, we find that defendant's constitutional right to a speedy trial was not denied.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NOS. THREE, FOUR AND FIVE:
By means of these assignments, defendant contends that his tape-recorded confession was not freely and voluntarily made as required by LSA-R.S. 15:451 and that he was subjected to treatment designed by effect on his mind to compel a confession as prohibited by LSA-R.S. 15:452. More specifically, defendant argues that the tape-recorded confession was given under duress and that "exposing him" to his emotional brother who was upset and crying, initiating interrogation at 1:30 a.m. and continuing to take oral statements (after the tape-recorded confession was made) by taking him to the crime scene and then to the location where a weapon was eventually found, constituted treatment designed to affect him emotionally and to induce the confession. Defendant concludes that the tape-recorded confession is inadmissible and, because the statements and reenactment of the crime at the crime scene and the gun were derived from the inadmissible confession, they too are inadmissible as fruits of the poisonous tree.
Officers Willie Graves, Cowart, Haley, and Jeansonne were the only witnesses who testified for the state at the March 11, 1986, pretrial suppression hearing.[13] Defendant was the sole witness who testified on his behalf at that hearing.
During his suppression hearing testimony, defendant looked at the advice of rights and consent to questioning form (S-19) bearing the date December 11, 1984, and the time 1:30 a.m. He admitted that his signature appears on both the advice of rights and consent to questioning portions of that form and that he was advised of his constitutional rights on the date and at the time indicated on the form. Defendant stated that he understood those rights and that threats were not used to obtain his signatures on the form. Defendant also acknowledged that he understood his rights when he signed the advice of rights portion of the form (S-14) which was presented to him when he arrived at the sheriff's office after being taken into custody on the evening of December 10.
In further suppression hearing testimony given by defendant, he indicated that during questioning by the police he was concerned about Dwight (his brother). Defendant testified that he kept asking about Dwight and asked the officers to let him see Dwight; when he was allowed to see Dwight, Dwight was not wearing a shirt, was cold, and looked like he had been crying. According to defendant, one of the officers (who testified at the suppression hearing and whose name he could not recall) told him that if he made a statement they would let his brother go. Defendant then testified that he remembered that Kearney Foster had told him that if he committed the instant offense and told them so he would be a man, that they would his let brother go, and that there was no sense in charging Dwight with a crime he did not commit.
The testimony of Willie Graves, Haley, Cowart and Jeansonne revealed that defendant was not in anyway threatened, intimidated or coerced to make a statement. Graves stated that no promises were made to defendant and that he did not hear anyone tell defendant that if he confessed his *143 brother would not be prosecuted. Haley testified that he did not promise anything to defendant for a statement, and Haley specifically denied making a statement to defendant that if defendant admitted shooting Otto Kennard he would let Dwight go. Cowart stated that he did not promise defendant anything for a statement and that he did not recall hearing a conversation about Dwight, and Jeansonne testified that he did not recall anyone promising defendant that nothing would happen to Dwight if defendant told the truth.
At the July 12-14 (second) trial, Kearney Foster testified[14] that, during questioning of defendant, he told defendant about Dwight having failed the polygraph test concerning Dwight's knowledge of the instant offense and expressed to defendant that defendant knew his brother did not kill the victim. Foster testified that he also told defendant that Dwight was saying that defendant killed the victim, that Dwight did not know any details about the killing and that if the officers wanted details they should talk to defendant. Foster explained that, in the foregoing context, he essentially told defendant that "[if] a man does a crime, he ought to do the time" and that "if you are a man, you ought to do what a man is supposed to do, you ought to get it straight." Foster specifically denied that anyone ever told defendant that if he gave a statement they would let Dwight go. Foster also denied that he or anyone in his presence had threatened, coerced or abused defendant.
During the (second) trial, Willie Graves acknowledged that Dwight had been shown to defendant through a two-way mirror before defendant's statement confessing to the instant offense. Consistent with defendant's testimony, Willie Graves stated the reason Dwight was brought to the two-way mirror was because defendant wanted to see Dwight. Defendant had questioned whether or not Dwight was at the jail and if Dwight was okay. Thus, Dwight was brought to the two-way mirror in order that defendant could see that Dwight was there, that he was okay, and that Dwight had no problems.
In order for a confession to be admissible into evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. LSA-R.S. 15:451. Confessions obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, are involuntary and inadmissible as a matter of constitutional law. The state has the burden of affirmatively proving the confession was free and voluntary. Therefore, if the defendant alleges police misconduct in eliciting a confession, it is incumbent upon the state to rebut these allegations specifically. State v. Horton, 479 So.2d 528, 530-531 (La.App. 1st Cir.1985), writ denied, 493 So.2d 1215 (La.1986). However, a confession is not rendered inadmissible by the fact that law enforcement officers exhort or adjure a defendant to tell the truth, provided the exhortation is not accompanied by an inducement in the nature of a threat or one which implies a promise of reward. State v. Mullins, 353 So.2d 243, 247-248 (La.1977); State v. Beck, 445 So.2d 470, 473 (La.App.2d Cir.), writ denied, 446 So.2d 315 (La.1984).
The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility will not be overturned on appeal unless they are not supported by the evidence. State v. Worthy, 532 So.2d 541, 544 (La.App. 1st Cir.1988), writ denied, 538 So.2d 610 (La.1989).
We have carefully reviewed the evidence presented at the suppression hearing and at trial and conclude that the lower court's ruling is supported by the evidence. The events surrounding the making of the confession by defendant, as related by the police officers, show that the confession *144 was made freely and voluntarily and not induced by threats, promises or coercion; and defendant admitted that he had been properly given his Miranda rights and that he understood those rights. Defendant's confession is not inadmissible merely because in making it he may have been motivated by a desire to protect his brother. Cf. State v. Weinberg, 364 So.2d 964, 971 (La.1978); State v. Brown, 504 So.2d 1025, 1031 (La.App. 1st Cir.), writ denied, 507 So.2d 225 (La.1987). The testimony of Willie Graves and defendant established that it was at defendant's request that defendant was allowed to view his brother; and, notwithstanding defendant's testimony to the contrary, the testimony given by police officers revealed that defendant's confession was not the result of any promise to release defendant's brother. Furthermore, under the circumstances presented herein, the statements made by Kearney Foster to defendant, i.e., "[if] a man does a crime, he ought to do the time" and "if you are a man, you ought to do what a man is supposed to do, you ought to get it straight," amounted to no more than exhortations to tell the truth unaccompanied by any inducement in the nature of a threat or promise of reward, which did not render defendant's confession inadmissible.
Thus, the confession was properly admitted into evidence; and, consequently, defendant's remaining argument (i.e., that his statements and reenactment of the crime at the crime scene and the gun were inadmissible fruits of his confession) necessarily falls since it was contingent upon the inadmissibility of his confession.
These assignments lack merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Indictment number 6965 jointly charged defendant and Dwight Stacey Lee, defendant's brother, with the first degree murder. However, the record reflects that, at the beginning of defendant's trial immediately before voir dire examination started, the trial court granted the state's motion to sever the charge in the indictment against Dwight Stacey Lee.
[2] Defendant briefed an additional argument not formally assigned as error (assignment number twelve in brief) asserting that the jury instructions given by the trial court were inadequate and confusing. However, in accord with the well-established jurisprudence of the Louisiana Supreme Court under the provisions of LSA-C. Cr.P. arts. 844 and 920, this Court will not consider any argument (such as the additional argument set forth above) which is neither assigned as error nor related to error patent on the face of the record. See State v. Spears, 350 So.2d 603, 605 n. 1 (La.1977); State v. Overton, 337 So.2d 1201, 1207 (La.1976).
[3] The record reflects that, when defendant was returned to the crime scene after his tape-recorded confession, a videotape was made at the scene; however, at the March 11, 1986, pretrial suppression hearing which was held on defendant's motion to suppress (which was styled "Motion to Suppress Evidence and/or Confession"), the district court suppressed the videotape. In all other respects, the district court denied the motion to suppress.
[4] S-14, S-19, S-22 and S-23 referenced above were state exhibits introduced at the (second) trial held on July 12, 13, and 14, 1988.
[5] The record reflects that the motion for discovery was filed on March 4 and that the state filed its answer to the motion on March 19, 1985.
[6] On October 3, 1985, the state filed an answer to this defense motion for discovery.
[7] Apparently, the trial which had been set for April 21, 1986, was continued until the following day because of the pendency of defendant's writ application.
[8] We note that, when the district court granted the motion to quash indictment number 5545 on April 22, 1985, it denied the motion to quash bill of information number 6452 which charged that defendant committed simple burglary of an inhabited dwelling (Otto Kennard's residence) on or about November 14, 1984, a violation of LSA-R.S. 14:62.2.
[9] Spina was overruled but on other grounds by State v. Gainey, 376 So.2d 1240 (La.1979) and State v. James, 305 So.2d 514 (La.1974).
[10] In KW 86 0703, we denied defendant's writ application insofar as it sought a reversal of the trial court's ruling denying the motion to quash bill of information number 6452 charging defendant with simple burglary of an inhabited dwelling. However, because our June 13, 1986, decision in KW 86 0703 left the previous trial court ruling quashing indictment number 5545 intact, as of June 13 defendant stood charged only with the simple burglary of an inhabited dwelling.
[11] The record reflects that defendant took the stand in his own defense at the first trial and that in doing so he indicated that Dwight Lee was responsible for the homicide. The state maintained in brief that defendant's trial testimony constituted evidence of which it had not previously been aware and that, as a consequence thereof, the state obtained the second indictment (number 6965) jointly charging defendant and Dwight Lee with first degree murder.
[12] These counsels represented defendant continuously from February 2, 1988, and throughout defendant's July 12-14, 1988, trial and August 23, 1988, sentencing proceeding; on appeal, different counsel represents defendant.
[13] The record includes the transcript of this hearing which was held (prior to defendant's first trial) on his motion to suppress statements. Although defendant filed a motion to suppress physical evidence on January 6, 1987, and a motion to suppress statements on April 18, 1988, the record does not reflect that another suppression hearing was ever held on either of these motions. In addressing defendant's assignments three through five, we choose to review the suppression hearing transcript from defendant's first trial even though under ordinary principles of appellate review we might not be compelled to do so. Cf. State v. Brooks, 505 So.2d 714, 721-722 (La.), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Furthermore, in addressing these assignments, we are not limited to the evidence adduced at the suppression hearing; we will consider all pertinent evidence given at defendant's second trial. See State v. Chopin, 372 So.2d 1222, 1223 n. 2 (La.1979); State v. Brown, 481 So.2d 679, 683 n. 1 (La.App. 1st Cir.1985), writ denied, 486 So.2d 747 (La.1986).
[14] We specifically note that Kearney Foster did not testify at the March 11, 1986, pretrial suppression hearing.